ROBERT J. GRALEWSKI, JR. (CA Bar No. 196410)
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: 858-834-2044
BGralewski@kmllp.com

DAVID E. KOVEL (*pro hac vice* forthcoming)
LAUREN WANDS (*pro hac vice* forthcoming)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
DKovel@kmllp.com
LWands@kmllp.com

*Counsel for Plaintiff and the Proposed Class*

[Additional Counsel Listed on Signature Page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| CONNOR HURLEY, individually, and on behalf of all others similarly situated, | Case No. 5:25-cv-883 |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| GOOGLE LLC, GOOGLE PAYMENT CORP., and ALPHABET INC., | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION...................................................................................................... 1

II.     PARTIES................................................................................................................... 7

        A.      Plaintiff...................................................................................................... 7

        B.      Defendants................................................................................................. 7

III.    JURISDICTION AND VENUE............................................................................... 8

IV.     FACTUAL ALLEGATIONS.................................................................................... 9

        A.      Google Unlawfully Maintains its Monopoly in the Market for Android
                App Distribution........................................................................................ 9

                1.      Google's Monopoly in Android App Distribution is a Product of
                        its Position in the Market for Licensable Mobile Operating Systems........... 9

                2.      Google Monopolizes the Market for Android App Distribution................ 10

                        i.      The Market for Android App Distribution is a Relevant
                                Antitrust Market ............................................................... 11

                        ii.     The Relevant Geographic Market is Canada................................. 15

                        iii.    Google Has Monopoly Power in the Android App
                                Distribution Market .......................................................... 16

                3.      Google Closes the Android App Distribution Market to Competitors........ 16

                        i.      Google Imposes Technical Barriers to Effectively Prevent
                                Third Parties from Distributing Apps Outside the Google
                                Play Store ...................................................................... 17

                        ii.     Google Uses Contracts to Prevent OEMs from
                                Circumventing Technical Barriers ................................. 24

                        iii.    Google Uses Contracts to Block Competing App Stores
                                from Distribution on the Play Store ................................. 25

                4.      Google Uses Exclusionary Contracts to Foreclose Competing App
                        Distribution through Pre-Installation ......................................... 26

                        i.      Google Forces OEMs to Enter MADAs that Effectively
                                Block the Entry of Competing App Stores....................... 27

i

a.    Google Forces OEMs to Enter MADAs ............................. 27

b.    Google's MADAs Discourage the Entry of
Competing App Stores ........................................ 28

ii.    Google Shares its Monopoly Profits with OEMs and MNOs
to Disincentivize the Entry of Competing App Stores ................... 30

5.    Google Disincentivizes the Creation of Competing App Stores with
Payments to and Restrictive Contracts with Potential Competitors ........... 32

i.    Google Shares its Monopoly Profits with OEMs and MNOs
to Disincentivize the Entry of Competing App Stores ................... 32

ii.    Google Bought Off Key App Developers to Stifle
Competition in the Android App Distribution Market ................... 34

6.    Anticompetitive Effects in the Android App Distribution Market ............. 37

B.    Google Unlawfully Maintains its Monopoly in the Android In-App
Payment Processing Market ........................................................ 38

1.    Google Has Unlawfully Tied Google Play Billing to the Google
Play Store ................................................................. 38

2.    Google Uses Its Unlawful Tie to Maintain its Monopoly in the
IAP Processing Market ................................................... 40

i.    The IAP Processing Market is a Relevant Antitrust Market ........... 40

ii.    The Relevant Geographic Market for IAP Processing is
Canada ................................................................ 42

iii.    Google Has Monopoly Power in the IAP Processing Market ......... 42

iv.    Google's IAP Processing Tie is Not Necessary to Incentivize
its Investment in the Play Store or Android ...................... 43

3.    The Origin and Rates of Google's Supra-Competitive Commission
Illustrate that Google Sets Prices at Will ................................ 45

4.    Google's Unlawful Tie Has Led to Anticompetitive Effects in the
IAP Processing Market ................................................... 46

C.    Google Engaged in Unfair and Deceptive Conduct ................................ 48

1.    Google Has Made False or Misleading Statements About
Sideloading Apps ......................................................... 48

2.   Google Has Made False or Misleading Statements About "Openness" ..................................................................... 50

3.   Google's False and Misleading Statements and Conduct Regarding Google Play Billing ..................................................... 52

V.   CLASS ACTION ALLEGATIONS ............................................................. 54

VI.   ANTITRUST INJURY ................................................................................. 55

FIRST CAUSE OF ACTION: Sherman Act § 1 ................................................. 56

SECOND CAUSE OF ACTION: Sherman Act § 2 ........................................... 58

THIRD CAUSE OF ACTION: Sherman Act § 1 ............................................... 60

FOURTH CAUSE OF ACTION: California Cartwright Act .............................. 61

FIFTH CAUSE OF ACTION: California Cartwright Act .................................. 63

SIXTH CAUSE OF ACTION: California Cartwright Act ................................. 64

SEVENTH CAUSE OF ACTION: California Cartwright Act ........................... 66

EIGHTH CAUSE OF ACTION: California Unfair Competition Law ............... 69

PRAYER FOR RELIEF ....................................................................................... 70

JURY TRIAL DEMANDED ................................................................................ 70

iii

Plaintiff Connor Hurley, on behalf of himself and as a representative of a class of similarly situated direct purchasers of apps and app-integrated digital content sold through the Google Play Store throughout Canada, and demanding a trial by jury, complains and alleges through his attorneys on information and belief as follows:

## I.    INTRODUCTION

1.      Mobile devices, including smartphones and tablets, are essential tools in contemporary life, both in Canada and in the rest of the world.[1] They are indispensable to consumers for personal communication, as well as for access to and participation in the modern economy. What makes a mobile device "smart" are the myriad applications ("apps") that can run on the device and are compatible with its mobile operating system. Consumers now spend more time using mobile devices than they do desktop computers, laptop computers, or televisions. App developers invest hundreds of millions of dollars to build and distribute apps for mobile devices.

2.      Google acquired the Android mobile operating system ("Android") in 2005. Google promised repeatedly that Android would be the basis for an "open" ecosystem in which industry participants could freely compete, and, in Google's words, have "[f]ull control of [their] brand and business." Google has not kept its word. This case is about doing the right thing in one important area, the Android mobile ecosystem, where Google unlawfully maintains monopolies in multiple related markets, denying consumers the freedom to enjoy their mobile devices—freedom that Google always promised Android users would have.

3.      Instead, Google has taken steps to close the ecosystem from competition and insert itself as the middleman between app developers and consumers. Unbeknownst to most consumers who own a mobile device running Android, every time they purchase an app from the Google Play Store, or purchase digital content or subscriptions within an app, the developer selling the app or in-

---

[1] As used herein, "mobile device" means a "smart" mobile device that has multi-purpose computing functionality; can connect wirelessly to the internet; has a large graphical user interface (as compared to "feature phones" common in past decades) which is often accessed through a touchscreen; and is optimized to run third-party mobile apps.

app content must pay a commission of up to 30% of the purchase price to Google as a kind of tax on the sale.

4.      To collect and maintain this extravagant and supra-competitive commission, Google has employed anticompetitive tactics to diminish and disincentivize competition for Android app distribution. Google not only has targeted potentially competing app stores but also has ensured that app developers themselves have no reasonable choice but to distribute their apps through the Google Play Store.

5.      Google did not stop at excluding potential threats to its app distribution monopoly and extracting monopoly rents for app distribution. Google also ensured it could (and would) continue to reap windfall commissions from apps after the Google Play Store distributed them to consumers—often months or even years later. Namely, Google imposed the same extravagant commission of up to 30% of any future purchase of digital content a consumer might make within an app. For all apps that consumers obtain from the Google Play Store, Google requires that consumers in Canada purchase any in-app digital content only through Google Play Billing. By imposing this unduly restrictive and anticompetitive tie, Google has collected (and continues to collect) supra-competitive commissions from consumers who purchase in-app digital content.

6.      For more than a decade, Google's Android has been the only viable operating system ("OS") available to license by mobile device manufacturers ("OEMs") that market and sell their devices to consumers. This has afforded Google tremendous leverage over mobile device manufacturers and Android app developers.

7.      In the absence of Google's anticompetitive conduct, there would be at least two main channels for consumers to obtain apps on for Android devices: (i) direct downloading and installation of apps or app stores; and (ii) apps or app stores pre-installed on devices by device manufacturers and/or mobile network operators.

8.      But Google has closed off its purportedly "open" Android operating system from competition in app distribution. To accomplish this, Google degraded direct distribution channels and cut deals to discourage and disincentivize any remaining potential competition.

9.      Through its Google Play Store, Google has engaged in exclusionary practices in the market for distribution of apps to Android device users, leveraging and abusing its position in the licensable OS market for mobile devices.

10.      Google requires all app developers that sell apps through the Google Play Store to sell all digital in-app content only through Google Play Billing. Though it has been inconsistent in the past, Google now stringently enforces this tie by preventing apps distributed through the Google Play Store from using, directing consumers to, or even informing consumers about alternative payment processing options that may provide lower prices. Consumers who want to purchase any such content must, therefore, do so through Google Play Billing. This illegal tie gives Google an additional monopoly in the market for Android in-app payment processing for digital products.[2] Google has not yet extended its tie to in-app purchases of physical goods and services and requires the use of an alternative payment provider. Accordingly, "in-app purchases" as used herein refers to purchases of digital content, not those of physical goods and services.

11.      Google has steadily expanded its illegal tie: effective September 2021, subscription streaming services for music and video—which Google previously exempted—must either submit to Google's tie or deny consumers the ability to purchase subscriptions from their Android apps. Google's comparable streaming services will gain an enormous competitive advantage. Moreover, the non-Google payment processors that these services currently use will be forced out of the in-app payment ("IAP") market as to these services. Google has also recently expanded the enforcement of its illegal tie to subscription services including those on job search, dating, fitness, and other apps.

12.      Google's anticompetitive conduct harms Canadian consumers both at the point of app distribution and when these consumers later purchase in-app digital content.

---

[2] Consumers who purchase apps or in-app digital content from the Google Play Store pay Google directly. From that purchase price, Google takes up to 30%, and transfers the remaining revenue to the app developer. *See Google Pay Help*, GOOGLE, https://support.google.com/paymentscenter/answer/7159343?hl=en ("The transaction fee for all purchases in Google Play (apps and in-app purchases) is 30% of the price the customer pays. In other words, developers get 70% of the payment and the remaining 30% goes to the distribution partner and operating fees.").

13.    Canadian consumers are direct purchasers of apps in the Google Play Store. These consumers are harmed because Google forces them to pay a supra-competitive commission of up to 30% to purchase any paid app and for in-app digital content. Google's anticompetitive conduct further harms consumers by depriving them of the potential benefits of true competition in app distribution (including in-app digital content), including better features or improved data security and privacy.

14.    Canadian consumers likewise are direct purchasers of in-app digital content using Google Play Billing. Because Google's tie prevents their use of other payment processors for in-app purchases, these consumers are harmed by paying Google's supra-competitive commission of up to 30%. Consumers are further harmed by the loss of competition among payment processors, which may offer substantially lower commissions, as well as enhanced payment features, customer service, and data security and privacy.

15.    As set forth below, Google's durable monopoly power in the markets for Android app distribution and in-app purchases is not based on competition on the merits. These monopolies are maintained through artificial technological and contractual conditions that Google imposes on the Android ecosystem.

16.    Today, Google enjoys virtually unchallenged power over Android app distribution and Android in-app sale of digital content in Canada. Because of Google's anticompetitive conduct, Google Play Store's market share faces no credible threats, and market forces cannot exert pressure on its supra-competitive commissions for app sales and in-app purchases. Google's conduct has deterred new entry and/or prevented would-be competitors from achieving the scale that might constrain Google's power.

17.    Over the years, Google has steadily expanded and refined the tactics it uses to impede competition in Android app distribution and in-app purchases. Instead of simply producing a better app distribution experience, Google uses anticompetitive barriers and mandates to protect its monopoly power and grow its supra-competitive revenue from the Google Play Store and Google Play Billing.

4

18.     Google has obstructed competition in Android app distribution and in-app purchases primarily through four categories of anticompetitive conduct, none of which has any legitimate justification.

19.     *First*, Google creates and imposes broad practical, technological, and contractual impediments to effectively close the Android app distribution ecosystem. Over the years, Google has deterred consumers from directly downloading and installing apps or app stores that might compete with the Google Play Store by, among other things, (a) imposing needlessly broad restrictions on direct downloading of apps and app stores, which Google calls "sideloading"; (b) using contracts with Android device manufacturers to prevent the manufacturers from modifying the operating system to circumvent the sideloading or code restrictions imposed by Google; and (c) blocking competing app stores from distribution on the Play Store.

20.     *Second*, Google has disincentivized and discouraged competition from the only market participants that could otherwise avoid the technological restrictions and be well-positioned to compete in app distribution—Android device manufacturers and mobile network operators. Google recognized these competitive threats and sought to eliminate them through a carrot-and-stick approach. The carrot is revenue share agreements that Google provides Android device manufacturers and mobile network operators—sharing Google's monopoly rents and, thereby, disincentivizing or restricting them from attempting to create or foster a competing app store. The sticks are contracts that require Android device manufacturers to preload Google Play Store on the default home screen, render it undeletable from the device, and ensure that no other preloaded app store has a more prominent placement than the Google Play Store.

21.     *Third*, Google launched incentive programs to share monopoly profits with large app developers that might be capable of disrupting Google's app distribution monopoly. Google did so to prevent these large app developers from fostering their own app store or moving en masse to a competing app store like Samsung's.

22.     *Fourth*, Google mandates that consumers who download apps from the Google Play Store also use Google Play Billing for all in-app purchases. This unlawful tie effectively precludes

an Android app consumer from purchasing additional digital content directly from the app developer or via the app developer's chosen payment processing service; Google forces the consumer to continue doing business with it and to indefinitely pay Google's supra-competitive commissions.

23.    In a more competitive environment, Google's app distribution monopoly would be disrupted. Instead, because of Google's exclusionary conduct, even Amazon, one of the world's largest and most sophisticated content distributors, has tried but failed to create an alternative Android app store that could weaken Google's app distribution monopoly through free and fair competition.

24.    In the absence of Google's unlawful tying conduct—requiring essentially all Android app customers to use Google Play Billing for in-app purchases of digital content—there would be vigorous competition in the Android in-app payment processing market, as exists in other payment processing markets. Google uses its durable monopoly power in the Android in-app payment processing market to extract a supra-competitive 30% commission from consumers—a figure over ten times greater than what other payment processors charge for purchases of non-digital goods through Android apps or for digital and non-digital goods on the internet.

25.    In December 2023, in a case brought by Epic Games, a jury unanimously found that Google had engaged in unlawful anticompetitive conduct in the distribution of mobile apps and in the handling of in-app payments.[3] The same conduct is also at issue in this case.

26.    For these reasons, the Plaintiff brings this action on his behalf and on behalf of a similarly situated class of Canadian consumers to end Google's anticompetitive conduct and the harm to that has flowed, and continues to flow, from that conduct. Plaintiff seeks to restore competition for the benefit of Canadian consumers and to prevent Google from engaging in similar conduct in the future.

---

[3] *See* Verdict Form, Doc. 606 *In re Google Play Store Antitrust Litig.,* Case No. 3:20-cv-050671-JD (Dec. 11, 2023).  This Court subsequently denied Google's request to throw out that verdict (*see* Order re Google's Renewed Motion for Judgment as Matter of Law or for New Trial in *Epic* Case, Doc. 674) and additionally found that Google's conduct violated California's Unfair Competition Law ("UCL") (*see* Order re UCL Claim and Injunctive Relief, Doc. 701).

## II.    PARTIES

### A.    Plaintiff

27.    Plaintiff Connor Hurley is a resident of Port Moody, British Columbia, Canada. Mr. Hurley currently owns a Google Pixel 8 mobile phone and has acquired a number of apps through the Google Play Store during the Class Period. He has also made in-app purchases of digital content, including a subscription from June 2023 to October 2023, and again from April 2024 to May 2024, made in an app obtained through the Google Play Store.

### B.    Defendants

28.    Defendant Google LLC is a Delaware limited liability company with its principal place of business in Mountain View, California. Google LLC is the primary operating subsidiary of the publicly traded holding company Alphabet Inc. The sole member of Google LLC is XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California, and a wholly owned subsidiary of Alphabet Inc. Google LLC owns and operates consumer services such as Android, Chrome, Gmail, Google Drive, Google Maps, Google Play, Google Search, YouTube, Google Cloud, and a wide range of digital advertising products for advertisers, advertising agencies, internet publishers, and app developers. According to Google's Canadian Terms of Service, these "services are designed to work together, making it easier for [the user] to move from one activity to the next." Google LLC contracts with app developers that distribute their Android apps through the Google Play Store and is thus a party to the anticompetitive conduct at issue here.

29.    Defendant Google Payment Corp. is a Delaware corporation with its principal place of business in Mountain View, California. It is a subsidiary of Google LLC. Google Payment provides in-app payment processing services to Android app developers and users. Google Payment collects a commission of up to 30% on many types of processed payments, including payments for apps sold through the Google Play Store and in-app purchases made within those apps, and thus is a party to the anticompetitive conduct at issue here. According to the Google Play Terms of Service, a user "must have a Google Payments account" "to purchase Content through Google Play."

30.     Defendant Alphabet Inc. is a Delaware corporation with its principal place of business in Mountain View, California. Google LLC is a wholly owned subsidiary of Alphabet Inc.

**III.     JURISDICTION AND VENUE**

31.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2) because sufficient diversity of citizenship exists between parties in this action, the aggregate amount in controversy exceeds $5,000,000, and there are 100 or more members of the proposed class.

32.     This Court also has subject-matter jurisdiction over Plaintiffs' federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331 and 1337.

33.     This Court has personal jurisdiction over the Defendants, and venue is proper in this Court under 15 U.S.C. § 22 and 28 U.S.C. § 1391 because Defendants transact business and are found within this District. Google LLC and Google Payment maintain their principal place of business in the State of California and in this District, because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District.

34.     Moreover, the Court has personal jurisdiction over all parties because Plaintiff and members of the proposed class, in order to make purchases on the Google Play Store or to make in-app purchases on apps distributed through the Google Play Store, were forced to accept the Google Play terms of service, which incorporate the Google terms of service, the latter stating "disputes will be resolved exclusively in the federal or state courts of Santa Clara County, California, USA, and you and Google consent to personal jurisdiction in those courts" and that California law will govern. Similarly, Plaintiff and members of the proposed class were forced to accept the Google Payment Terms of Service, which also require that each party "agrees to submit to personal and exclusive jurisdiction of the courts located in Santa Clara County, California" and that "the laws of California … and applicable federal United States laws" apply.

IV.    **FACTUAL ALLEGATIONS**

A.    **Google Unlawfully Maintains its Monopoly in the Market for Android App Distribution**

1.    **Google's Monopoly in Android App Distribution is a Product of its Position in the Market for Licensable Mobile Operating Systems.**

35.    Mobile devices are the ubiquitous handheld, portable electronic devices that allow users to perform myriad communications and computing functions, such as browsing the internet, navigating traffic, paying bills, accessing social media, playing games, and streaming videos and music. For many consumers, mobile devices such as smartphones have largely replaced laptop and desktop computers for a wide variety of computing tasks

36.    Mobile devices, like personal computers, require an operating system ("OS") to provide the multi-purpose computing functionality such devices are capable of. A mobile OS is one built for a mobile device.

37.    To be useful to consumers, a mobile OS must be able to run software applications, or "apps." Apps let users perform most of the functions associated with mobile devices—tasks like navigation, web browsing, ordering groceries, playing games, and communicating through email and text messaging. A mobile OS facilitates the use of apps through code, such as application programming interfaces ("APIs"), which app developers use to create apps that are compatible with the OS.

38.    Entities that manufacture mobile devices are referred to as original equipment manufacturers ("OEMs").

39.    OEMs pre-install an OS on each mobile device so that a consumer has immediate access to basic functions, such as cellular or Wi-Fi connectivity, camera and video recording, and the installation, operation, and update of mobile apps. Mobile devices are designed to work with a particular mobile OS, and there is no appreciable aftermarket for mobile OSs.

40.    Most OEMs, besides Apple, do not develop their own OS but instead license a third party's OS for their devices. Therefore, there is a relevant market for licensable mobile OSs, which OEMs license and install on their mobile devices.

9

41.    By contrast, Apple uses a proprietary OS ("iOS") for its mobile devices, including iPhones and iPads, and does not license iOS to other OEMs. The market for licensable mobile OSs does not include OSs that are proprietary and cannot be licensed by OEMs (such as Apple's iOS).

42.    The licensable mobile OS market also excludes OSs that are unsuitable for mobile devices, such as OSs for simple cell phones, "flip phones," or feature phones, or for other electronic devices (such as laptop computers, desktop computers, and gaming consoles, e.g., Nintendo DS, Xbox, PlayStation) that are not mobile devices.

43.    Almost all mobile devices and the mobile OSs they run require consumers to contract with a mobile network operator ("MNO") to communicate and access the internet wirelessly.

44.    In 2005, Google acquired the Android OS, which it makes available under an open-source license. "Open source" means, in theory, that the code can be accessed, used, and modified by anyone, for free. But in practice, Google tightly controls Android and thwarts commercial use of anything but the Google-sanctioned version.

45.    Android is now "open source" in name only. The Google-certified version of Android OS powers nearly all current Android devices (going forward, "Android" will refer to the Google-certified version of the Android OS). As of July 2020, over 99% of smartphones with licensed mobile OSs were powered by Android.

46.    There are extremely high barriers to entering the licensable mobile OS market, including the cost of research and development, powerful network effects that give rise to barriers to entry, and high switching costs for consumers and app developers from one OS to another. Large companies such as Microsoft and Amazon have attempted to enter and gain viable scale in the market, with only very limited success.

47.    Google currently possesses durable monopoly power in the market for licensable mobile OSs, which (as described below) the company has leverages as part of its unlawful efforts to monopolize the Android app distribution market.

**2.    Google Monopolizes the Market for Android App Distribution**

48.    Google has, through its anticompetitive conduct, unlawfully maintained monopoly

power in the market for distributing apps on Android.

49.     Apps on mobile devices are akin to software applications on a personal computer. As with applications on a personal computer, some apps may be pre-installed by the OEM, but consumers typically obtain additional applications or apps to meet their specific needs and preferences.

50.     On personal computers, application distribution is competitive and diffuse. Consumers download applications from a variety of sources, including the application developer's website or stores on websites such as Amazon, Apple, Microsoft, Google, or Steam.

51.     On Android devices, however, Google has substantially foreclosed potential competition from alternative means to download apps, effectively eliminating consumers' choice. The Google Play Store is the only practical means to obtain apps for the vast majority of Android consumers.

### i.     The Market for Android App Distribution is a Relevant Antitrust Market

52.     There is a relevant product market for the distribution of apps to users of Android mobile devices (the "Android App Distribution Market").

53.     The market includes all channels by which Android apps on mobile devices may be distributed to consumers. This includes the dominant Google Play Store, which accounts for well over 90% of Android mobile app distribution. It also includes smaller app stores such as those maintained by Samsung, Amazon, and Aptoide. In addition, it includes direct downloading of apps by consumers without using an app store, which Google terms "sideloading." Competing app stores that are not preinstalled can also be sideloaded.

54.     The Android App Distribution Market does not include mobile distribution of apps that are compatible with other OSs, such as Apple's iOS. A monopolist app distributor on Android mobile devices is not constrained from raising prices, or reducing quality or innovation, by app distribution on Apple's devices (or on any other mobile devices that use an alternative to Android or on desktop devices), due to market imperfections such as high switching and information costs.

55.     In the face of a small price increase (or a small reduction of quality) in app

11

distribution within Android, a consumer would be highly unlikely to switch to an Apple device for three primary reasons.

56.     *First*, consumers are deterred from leaving the Android ecosystem due to the difficulty and costs of switching. Consumers choose a smartphone based in part on the OS that comes pre-installed on that device and the ecosystem in which the device participates (in addition to a bundle of other features, such as price, battery life, design, storage space, and the range of available apps and accessories). Once a consumer has selected a smartphone, the consumer cannot replace the mobile OS that comes pre-installed on it with an alternative mobile OS. Rather, a consumer who wishes to change the OS must purchase a new smartphone entirely. In addition, mobile Oss have different designs, controls, and functions that consumers must learn to navigate. Over time, consumers who use Android devices learn to operate efficiently on the Android OS. For example, the Android OS layout differs from iOS in a wide range of functions, including key features such as searching and installing "widgets" on the phone, organizing and searching the phone's digital content, configuring control center settings, and organizing photos. The cost of learning to use a different mobile OS is part of consumers' switching costs.

57.     *Second*, switching from Android devices may also result in a significant loss of personal and financial investment that consumers put into the Android ecosystem. Because apps, in-app content and many other products are designed for or are only compatible with a particular mobile OS, switching to a new mobile OS may mean losing access to such products or to data. Even if versions of such apps and products are available within the new ecosystem chosen by the consumer, the consumer would have to go through the process of downloading them again onto the new devices and may have to purchase them anew. As a result, the consumer may be forced to abandon his or her investment in at least some of those apps, along with any purchased in-app content and consumer-generated data on those apps.

58.     *Third*, consumers are not able to avoid the switching costs and lock-in to the Android OS ecosystem by acquiring more information prior to the purchase of the Android device. The vast majority of mobile device consumers have no reason to inquire, and therefore do not know about,

Google's anticompetitive contractual restraints and policies. Furthermore, these consumers rationally do not give much weight to Google's anticompetitive conduct and anticompetitive fees when deciding whether to switch from an Android device. Consumers consider many features when deciding which smartphone or tablet to purchase, including design, brand, processing power, battery life, functionality, and cellular plan. These features are likely to play a substantially larger role in a consumer's decision as to which smart mobile device to purchase than Google's anticompetitive conduct in the relevant markets, particularly given that a consumer may consider the direct monetary cost of Google's conduct to be small relative to the price of smart mobile devices, if the consumer is even aware of the conduct or assigns it such a cost at all. For example, over time a typical Android user may make multiple small purchases of paid apps and in-app digital content—accumulating to $100 or less annually—but may spend several hundreds of dollars at once to purchase an Android smart mobile device.

59.     Consumers also are unable to determine the "lifecycle price" of devices—*i.e.*, to accurately assess at the point of purchase how much they will end up spending in total (including on the device and all apps and in-app purchases) for the duration of their ownership of the device. In advance of purchasing a device, consumers cannot know all of the apps or in-app content that they may want to purchase during the usable lifetime of the device. Consumers' circumstances may change. Consumers may develop new interests. They may learn about new apps or in-app content that becomes available only after purchasing a device. New apps and in-app content will continue to be developed and marketed after a consumer purchases a smartphone or tablet. All these factors may influence the amount of consumers' app and in-app purchases. Because they cannot know or predict all such factors when purchasing mobile devices, consumers are unable to calculate the lifecycle prices of the devices. This prevents consumers from effectively taking Google's anticompetitive conduct into account when making mobile device purchasing decisions.

60.     Nonetheless, consumers might attempt to factor Google's conduct into their decisions to move away from Android, but Google has inhibited consumers' ability to make that informed choice. Most consumers are unaware of Google's supra-competitive commissions, which

Google does not publicize or itemize on its Play Store billing statements. Google likewise conceals its anticompetitive technological and contractual constraints that give the Google Play Store an unfair competitive advantage in Android app distribution. Indeed, Google has continually made false or misleading representations to consumers and others regarding Android's and the Play Store's purported "openness," which consumers would reasonably understand to mean that Google does not engage in these anticompetitive practices. There is significant information asymmetry between Google and consumers, who cannot easily discover and make informed decisions based on Google's anticompetitive conduct, let alone consent to them simply because they purchase an Android mobile device.

61.    Moreover, the Google Play Store and the Apple App Store do not compete directly because they and the apps they distribute function with only one mobile OS and cannot work on an incompatible mobile device. As the Majority Staff of the Subcommittee on Antitrust, Commercial and Administrative Law of the House Committee on the Judiciary concluded in its October 2020 report, "Investigation of Competition in Digital Markets," (hereafter referred to as the "House Majority Report"):

> Apps are not interoperable between operating systems—native apps developed for [Apple's] iOS only work on iOS devices, and native apps developed for Android only work on Android devices. The [Apple] App Store and the [Google] Play Store do not compete against one another. Android users cannot access the Apple App Store and iOS users cannot access the Google Play Store, so the dominance of the Play Store is not constrained by the App Store and vice versa.

62.    Consumers who purchase Android devices are thus effectively locked into Android and whatever app distribution is available in the Android ecosystem. Google's control of Android gives it special access to Google Play Store consumers that app distribution competitors lack and cannot obtain, due to Google's anticompetitive restrictions discussed below.

63.    Google's market power over app distribution is also not constrained by the Apple App Store, because for developers, distribution on iOS is not an adequate substitute for distribution on Android. *First*, apps written for iOS cannot be run on an Android device, and vice versa. The operating systems are written in different programming languages, and each app must be written to

14

be compatible with the underlying OS. Thus, the switching costs of "porting" an existing app to a new OS are large, as the app must be significantly rewritten. *Second*, most developers of apps cannot reasonably choose between iOS or Android but develop their apps for both operating systems. Just as major personal computer software developers like Microsoft and Adobe must create software versions compatible with both the Microsoft Windows OS and Apple macOS to satisfy consumer expectations, major app developers like Netflix, Spotify, Match Group, Facebook, and Epic Games must incur the costs of developing apps compatible with iOS and Android, or their apps would not be accessible by a significant portion of mobile device users. This is particularly true for apps that facilitate interaction among users (e.g., dating, online gaming, and social media apps) or serve as platforms for two or more groups of users (e.g., digital commerce and ridesharing).

64.     Because of Google's anticompetitive conduct, the Android App Distribution Market is currently dominated by a single method of distribution, the Google Play Store. But for Google's anticompetitive conduct, the Google Play Store would face real competition from other app stores— such as Samsung's Galaxy Store or Amazon's Appstore—and other methods of app distribution, like direct downloads from websites. Google's successful campaign to quash competition in app distribution has ensured that these alternative methods of distribution now account for only a small share of the market, and the vast majority of app developers and consumers do not consider them reasonable substitutes for the Google Play Store.

65.     Google's anticompetitive conduct has harmed consumers through supra-competitive prices. Google's exclusionary conduct also reduces overall output by damaging or destroying alternative avenues of app distribution that consumers would otherwise use. Rather than competing on the merits, and creating more efficient, innovative, or less expensive app distribution, Google simply blocks its competitive threats.

### ii.     The Relevant Geographic Market is Canada

66.     Canada is a relevant geographic market for Android App Distribution. The apps available, and desirable, to consumers vary on a country-by-country basis. For instance, app stores frequently have country-specific "storefronts," and Canadian consumers cannot access the

storefront available to users in another country. Google also sets certain app distribution and payment requirements for developers on a country-by-country basis, including in-app sales currency and price range requirements. App distribution markets available in other countries are not reasonable substitutes for app distribution markets in Canada.

### iii.   Google Has Monopoly Power in the Android App Distribution Market

67.   Google possesses a durable monopoly in the Android App Distribution Market, causing ongoing harm to competition and injury to consumers. The Google Play Store's monopoly power is evidenced by (a) its market share and lack of meaningful competition; (b) Google's large profit margins; and (c) Google's ability to control the price that consumers must pay to purchase an app on the Google Play Store.

68.   Through its anticompetitive conduct, Google corrals Android mobile device users into downloading apps through one channel—the Google Play Store. As a result, well over 90% of apps on Android devices are acquired from the Google Play Store. A 2017 internal Google report confirmed that "Play Store dominates in all countries," including Canada.

69.   Although Google leaves open the technical possibility for Android consumers to acquire some apps without using the Play Store, this can only be accomplished through a competing app store installed on the device (either through preloading by an OEM or through the user sideloading the store), or through sideloading of individual apps. Google takes various steps to discourage OEMs from directly competing or sponsoring any app store competition. Google makes the sideloading process unnecessarily cumbersome and impractical by adding superfluous, misleading, and discouraging security warnings and by deterring users by requiring them to grant permission multiple times for a single app installation. The effect of Google's conduct is to practically eliminate competition in Android app distribution.

### 3.   Google Closes the Android App Distribution Market to Competitors

70.   Google employs various tactics to prevent competitive entry into the Android App Distribution Market, including imposing needlessly broad restrictions on direct downloads; using contracts with OEMs to prevent them from circumventing Google's direct-downloading restrictions

by modifying the OS; blocking competing app stores from distribution on the Play Store; and preventing non-Play apps and app stores from purchasing advertising on key Google properties including YouTube, Google Search, and the Google Display Network.

   **i. Google Imposes Technical Barriers to Effectively Prevent Third Parties from Distributing Apps Outside the Google Play Store**

   71. Google owns the Android OS, which is used in 99% of mobile devices that run a licensable mobile OS. Google's control of Android enables it to impose technical barriers that effectively prevent third parties from distributing apps and app stores outside the Google Play Store. Google claims that, outside the Play Store, consumers "are able to install additional app stores if they choose." In reality, Google imposes a series of technological challenges and pretextual warnings designed to prevent users from directly downloading—or "sideloading"—these apps or app stores. The term "sideloading" reveals Google's view of the Android App Distribution Market: consumer use of the default Google Play Store is encouraged and expected, whereas use of a competing means of distribution is an aberration.

   72. Having recognized that sideloading constitutes a competitive risk to its business, Google has been waging "an arms race to prevent sideloading" by degrading the consumer experience. To do this, Google embeds its generally misleading warnings and hurdles to sideloading into the Google-certified Android OS.

   73. Figure 1 presents three examples of the obstacles and ominous warnings about the supposed danger of directly downloading and installing apps that consumers encounter during this process. In one, Google warns that the installation file "can harm your device." Next, Google simply blocks the attempted download, stating "your phone is not allowed to install unknown apps from this source" and presenting to the user only "Cancel" and "Settings" options (with no indication that installation is possible through the "Settings" option). In the third, Google warns that the user's "phone and personal data are more vulnerable to attack by" the "unknown app," and requires the user to actively opt in to select a feature by which he agrees that he is "responsible for any damage" to the phone "or loss of data that may result" from the installation.

1

**Figure 1**

2



3

4

5

6

7

8

9

10

11

12

13

14

15

**Figure 2**

16

## Download apps from other sources

17

**Important:** If you download apps from unknown sources, your phone and personal information can be at risk.

18

· Your phone could get damaged or lose data.

· Your personal information could be harmed or hacked.

19

20

Help Google protect against bad apps from other sources                              ∧

21

· If you install apps from outside of Google Play, your phone can send Google information about those apps.

22

23

· This information helps Google better protect everyone from harmful apps. The information can include log information, URLs related to the app, device ID, Android version, and IP address.
Learn about Google Play Protect.

24

25    74.    Google's own website promotes the misleading and overbroad premise that directly

26    downloading apps from "unknown sources" other than the Play Store inherently presents dangers

to the device irrespective of source, as illustrated in Figure 2.

27

28    75.    Google staff have acknowledged internally that the hurdles it erects to sideloading

18

lead to a "[p]oor user experience," in that there are "15+ steps to get app vs 2 steps with Play or on iOS," as a 2018 presentation to senior executives stated. Google knows that it is degrading the user experience with its sideloading obstacles in order to protect its Android app distribution monopoly.

76.      Downloading and installing an app on a mobile device is not materially different from downloading and installing software on a personal computer. Millions of personal computer users do this safely and easily every day. Amazon described the process for downloading alternative app stores as follows:

> [E]ven for consumers who discover and download an alternate store outside of the Play Store, Google has configured Android to block the installation of that store. Consumers are unable to install downloadable app stores unless the consumer first navigates to and changes Android's obscure "Unknown Sources" setting to allow installation of apps from sources other than the Play Store. When consumers attempt to change this setting, Google displays a message warning that "Your [device] and personal data are more vulnerable to attack by apps from unknown sources. You agree that you are solely responsible for any damage to your [device] or loss of data that may result from using these apps."

77.      The House Majority Report provided a similar description:

> Google has created significant friction for sideloading apps to Android devices. One developer explained to Subcommittee staff that sideloading entails a complicated twenty-step process, and users encounter multiple security warnings designed to discourage sideloading. Additionally, software developers that have left the Play Store to distribute software to Android users via sideloading have experienced precipitous declines in downloads and revenue and report problems updating their apps. Thus, the option for sideloading apps on mobile devices does not discipline the market power of dominant app stores.

78.      Google's warnings to users grossly exaggerate the risk of sideloading. A 2015 presentation to OEMs stated that "potentially harmful applications" constituted a mere fraction of a percentage point of all app installs and that given the low security risks "some of the third-party security services that are required on other platforms (such as AV [anti-virus software] and anti-malware) are not necessary on Android." Rather, "the single largest threat to Android security" instead flowed from failures by OEMs to update users' devices with security patches.

79.     Google's public claims about the security of Android belie the warnings it provides users who attempt to sideload, in several ways. *First*, Google has claimed that it "analyzes every app that it can find on the internet" and categorizes a subset of them as "Potentially Harmful Applications," or PHAs. Yet its user warnings falsely describe even a highly popular app from a well-known developer, such as the Amazon Appstore, as an "unknown app." This gives consumers the false impression that even apps Google certainly must have analyzed and determined were not PHAs nevertheless present an appreciable risk of "damage" to the user's phone, causing data loss, or exposing the user's personal information.

80.     *Second*, Google has touted Android's built-in security measures as scanning "more than 100 billion apps every day." Android then directs users to take action against PHAs it finds on their devices or automatically disables them. Given its unique access to app usage data and expertise in app security and privacy, Google has an unparalleled ability to provide accurate information and warnings on PHAs. Yet it chooses to provide inaccurate information instead. Even if an app has been sideloaded by thousands of other users, scanned repeatedly by Google, and found to be harmless, Google will warn each additional user who tries to sideload the app that it is potentially harmful and from an "unknown source." This practice is misleading and exclusionary.

81.     *Third*, Google has told users that Android is "secure to the core," and that "we guard each app at the operating system level, so other apps won't snoop on what you do." According to a 2020 Google white paper:

> Application sandboxing isolates and guards Android apps, preventing malicious apps from accessing private information. Android also protects access to internal operating system components, to help prevent vulnerabilities from becoming exploitable. Mandatory, always-on encryption helps keep data safe, even if devices fall into the wrong hands.

82.     If Android security is as robust as Google claims, its warnings against sideloading falsely overstate any potential "harm"—particularly as to widely used apps and app stores, from reputed developers, which Google has analyzed and found to be harmless. It is impossible to reconcile Android's robust security features and Google's own estimations of Android's superior

20

safety features with the idea that direct user downloading of apps is dangerous. Android safety mechanisms like sandboxing operate regardless of how an app was downloaded—whether from the Google Play store or another source.

83.    Moreover, Google's own data demonstrates that its warnings overstate the potential "harm" of sideloading. A 2018 Google white paper stated that PHAs are present on "only 0.08% of devices that exclusively used Google Play" and on "0.68% of devices that installed apps from outside of Google Play." Even taken at face value, the miniscule proportion of Android devices that sideload apps and were found to harbor PHAs does not justify Google's misleading and unfairly broad-brush warnings against sideloading. Nor should these figures necessarily be taken at face value, because they include PHAs that (1) were installed by OEMs, not users; (2) were explicitly sought out by users who understood their underlying risks, such as "power users" who want to customize their devices; and (3) are not harmful to a user, such as "click fraud apps … that may harm advertising networks but not users."

84.    Even if a user overcomes Google's obstacles to direct downloading, the user faces continuous additional difficulties in keeping the sideloaded app or app store up to date. This is because Google prevents sideloaded apps and app stores from updating in the background. Instead, users who sideload apps or app stores must manually approve every update via a multistep process. Amazon's website describes that process: "1. Open the app store you used to install the app on your device. 2. Search for the app and open the app's detail page. 3. If an update is available, an Update option displays." This multi-step process for updates further discourages consumers from using alternatives to the Play Store.

85.    Google created Android to allow sideloading, in order to gain scale and maintain its image of "openness." After achieving dominance, however, Google increasingly saw sideloading as a threat to the Play Store and erected numerous barriers to thwart it.

86.    Google knew that these barriers would work to protect its app distribution monopoly. For example, when considering the possibility that Epic might launch Fortnite as a direct download, Google noted in internal communications the technical difficulties that it had created. Google "knew

from [their data]" that the "install friction" associated with sideloading "is not only a bad experience" for users but would also "drastically limit [Fortnite's] reach." In addition to the poor user experience associated with sideloading, "future updates will be challenged re: targeting, update experience via web," "the approach will create significant user confusion, since the store will attract billions of users who will search for Fortnite and run into dead ends that aren't clear how to resolve," and "launching this way makes it hard to work on top tech issues, e.g. can't easily go back and graft on a piracy solution, collaborate on other experiences/tech issues." The "app update experience" for sideloading apps was poor compared to that of Play-distributed apps. "By using sideloading, every single Fortnite update will need to be approved by the user by clicking on 'INSTALL' in a dialog . . . . After that user[] must wait for completion. Since Fortnite is a large app . . ., [the] update will likely take a long time to be installed. Meanwhile, Play could provide auto-updates in the background that are nearly invisible to the user."

87.     Google also discussed the viability of Amazon's app store given its distribution through the Amazon website via a sideloading process. To allow a sideloaded app to install other apps, the user must enable unknown sources for the app that will perform the installations (e.g., Chrome, Amazon App Store, etc.)." This is not a simple process. The user must first enable the "unknown sources" download permission within Android's settings to allow the download of the store itself. After completing this step, a further step is required each app install through that app store. As Google explained, when the app store downloads apps through the new store, the user "do[esn't] get a silent install. The user will still need to click on 'INSTALL' to confirm. The only way to install directly without this dialog is to have a system permission (like Play does, or FB installer). Non system apps can't get this permission."

88.     Google's warnings against sideloading are another barrier that thwart competition from competing app stores and the threat of apps distributing directly via sideloading. For example, consumers who tried to use Aptoide, a competitor Android app store, received the message shown in Figure 3.

CLASS ACTION COMPLAINT

1  **Figure 3**



12      89.     An independent study of Android app stores published in 2017 ranked Aptoide as

13  the safest among the Android app stores analyzed and safer than Google Play Store itself. But as a

14  result of Google's misleading warning that to keep the Aptoide App would be "UNSAFE" and

15  Google's further actions to actually remove Aptoide from users' phones without users' knowledge,

16  Aptoide lost 15-20% of its user base between June 2018 and June 2019. While a Portuguese court

17  barred Google from removing the app store without users' knowledge in response to related

18  litigation, Google retained its exclusionary warnings and technological hurdles.

19      90.     Google has acknowledged that the security settings and warnings associated with

20  sideloading limit even mainstream, non-malicious apps and app stores from reaching Android users.

21  Even secure, highly curated Android apps and app stores like Fortnite and the Amazon Appstore

22  were subject to such warnings. When Fortnite decided to launch via sideloading, Google noted

23  internally that their Android reach without the Play Store would be significantly lower as only 15%

24  of Android users in the United States (a top revenue market for Fortnite) had "unknown sources"

25  enabled. In the same document, Google discussed how the security warnings and barriers affected

26  the viability of Amazon's app store, asking "How difficult is it [for Amazon] to get users to

27  understand what to do?" and noting that "users need[] to understand unknown sources."

28

91.     Google's conduct harms consumers and competition, as demonstrated by a 2016 internal Google report indicating that only a negligible percentage of Android app downloads in the United States were sideloaded. If not for Google's restrictions on sideloading, more app distributors and developers would directly distribute their apps and app stores to consumers. Google makes sideloading substantially and unnecessarily difficult and in some cases prevents it entirely.

92.     There is no legitimate reason for Google's conduct. Indeed, for decades the users of personal computers have been able to install software acquired from various sources without being deterred by anything like the obstacles erected by Google. Now, a user can navigate to the Internet webpage sponsored by the developer of software he/she desires, click once or twice to download and install an application, and be up and running, often in a matter of minutes. The operating systems used by personal computers efficiently facilitate this download and installation (unlike Android), and security screening is conducted by a neutral security software operating in the background, allowing users to download software from any source they choose (unlike Android).

93.     Google's anti-competitive and unjustified restrictions on distributing apps through any means other than its own app store contradict its own claims that Android app developers can "us[e] any distribution approach or combination of approaches that meets your needs," and that developers can even provide consumers "apps from a website or [by] emailing them directly to users."[4] In reality, Google specifically prevents app developers from effectively availing themselves of alternative distribution channels that it touts today.

94.     Even assuming that there were a legitimate justification for Google's conduct—and there is not—Google has pursued those goals by methods that are substantially more restrictive than necessary.

### ii.    Google Uses Contracts to Prevent OEMs from Circumventing Technical Barriers

95.     To prevent frictionless sideloading of competing app stores, Google has imposed

---

[4]     Google    Play    Developers    Page,    *Alternative    distribution    options*, https://developer.android.com/distribute/marketing-tools/alternative-distribution    (last    accessed June 25, 2024).

contractual restraints on OEMs. An OEM that wishes to market an Android device with Google's proprietary apps and services must first sign an Anti-Fragmentation Agreement (AFA) or, more recently, an Android Compatibility Commitment (ACC). AFAs and ACCs have two key provisions: signatories must (1) refrain from "any actions that may cause or result in the fragmentation of Android" ("anti-fragmentation provision"); and (2) agree to restrictions on the manufacture and sale of devices running forked versions of Android ("anti-forking provision"). The agreements also require OEMs to comply with the Compatibility Definition Document and the requirements of Google's Compatibility Test Suite.[5]

96.     The AFA and ACC compatibility standards require OEMs to implement Google's restrictions and warnings about sideloading. As such, these agreements foreclose OEMs from modifying Android to offer frictionless sideloading of competing app stores, which Google would consider an impermissible "Android fork."

### iii.    Google Uses Contracts to Block Competing App Stores from Distribution on the Play Store

97.     Google forces app developers, as a condition of appearing in the Google Play Store, to sign a non-negotiable Developer Distribution Agreement ("DDA"). Section 4.5 of the DDA prohibits developers from using "Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play." In other words, no app on the Play Store may compete in the Android App Distribution Market. The DDA also gives Google the right to remove and disable any Android app that Google determines violates this agreement.

98.     Google has imposed this restriction since at least 2009, when the section was labeled "Non-Compete" and applied to distribution through Android Market (the name of Google's app

---

[5] Anti-fragmentation provisions in the AFAs and ACCs prevent manufacturers and carriers from distributing software and hardware that is not "Android compatible" and from creating or distributing software development kits (SDKs) that compete with Google's SDK (the software development tool that developers must install in their apps to access the Google Play Services APIs). Manufacturers are prohibited under the agreements from taking actions that result in the fragmentation of Android.

store before it was rebranded as the Google Play Store). Over time, Google has tightened the anticompetitive restrictions in Section 4.5 in response to specific threats posed by app distribution competitors such as Amazon.

99.     The original language of the DDA was limited to apps that had a "primary purpose" of facilitating distribution of apps outside of Android Market, which allowed some flexibility for developers to use the Play Store to distribute Android apps that also linked to apps that could be downloaded outside Google's app store. In 2012, however, when Amazon attempted to distribute its app store to consumers directly through its Amazon Store app, distributed on the Play Store, Google took swift action. Amazon used a browser within the app to direct users to a page to download Android application files, which use the extension ".apk." This effectively allowed customers to download Amazon apps without going through the Play Store. Google alleged this was a violation of the DDA agreement and threatened to remove Amazon from the app store, days before Black Friday.

100.     Google eventually changed its policy in response to Amazon's Store app. In September of 2014, Google updated Section 4.5 of the DDA to "provide additional clarity around the distribution of third-party apps on Google Play to maintain a secure ecosystem." Eventually, Amazon was forced to disable this functionality, and its app store was only available via sideloading, a process that makes it significantly harder to reach Android users.

### 4.     Google Uses Exclusionary Contracts to Foreclose Competing App Distribution through Pre-Installation

101.     As noted above, Google has foreclosed OEMs from enabling frictionless sideloading of competing app stores with the AFAs and ACCs, which require OEMs to implement Google's restrictions, warnings, and messaging about sideloading. To disincentivize OEMs and MNOs from pre-installing viable competing app stores, Google went further by imposing additional contractual restraints under the terms of two additional contracts: Mobile Application Distribution Agreements ("MADAs") and Revenue Share Agreements ("RSAs"). Google's anticompetitive contracts with OEMs and MNOs have existed since shortly after the launch of the Android platform and Android Market, and the evolution of those contracts to become ever more restrictive mirrors the increasing

1    strength of Google's monopoly.

2        **i.    Google Forces OEMs to Enter MADAs that Effectively Block the Entry**
             **of Competing App Stores**

3

4        102.    Having signed an AFA or ACC, an OEM can then license Google's proprietary apps

5    and APIs and market its devices as Google-certified Android devices by entering into a MADA with

6    Google. MADAs authorize distribution of Google Mobile Services, a bundle of Google's

7    proprietary apps including the Play Store, along with the Google Play Services APIs that enable

8    apps to access key functionalities. The MADAs also require manufacturers to make certain Google

9    apps, like the Google Play Store, undeletable, and to give Google the most valuable and prominent

10   real estate on the default home screen.

11       **a.    Google Forces OEMs to Enter MADAs**

12       103.    Google employs various coercive tactics to force OEMs to enter its MADAs, such

13   as withholding key inputs for mobile devices (e.g., must-have Google apps and Google Play

14   Services) and revenue share payments unless they agree to enter a MADA with Google.

15       104.    Google does not allow OEMs to manufacture Android devices or use the Android

16   trademark unless the OEM enters into a MADA with Google.

17       105.    Google also conditions licensing of Google Mobile Services on an OEM entering

18   into a MADA. Google Mobile Services includes a bundle of proprietary Google apps, including the

19   Play Store and various must-have apps such as Gmail, YouTube, and Google Maps.

20       106.    In addition, OEMs are not given access to Google Play Services unless the OEM

21   agrees to enter into a MADA with Google. Google Play Services is a set of proprietary application

22   programming interfaces ("APIs") that enable apps to perform many essential tasks but are excluded

23   from the "open-source" Android code. APIs are interfaces for accessing "libraries" of prepackaged

24   computer code that assist different pieces of software in communicating with one another. App

25   developers typically use APIs when they want their app to request data from the operating system

26   or from other applications, among other tasks.

27       107.    The Google Play Services APIs are essential to app developers for building app

28   functionalities like push notifications, locating a user, displaying a user's location on a map, and

maximizing ad revenue.[6] The great majority of the top paid and unpaid Android apps employ APIs found only in Google Play Services. While some of the APIs in Google Play Services relate directly to Google's products and services, others offer basic "OS" functionality, like accessing the device's sensors and streaming video to a television. By locking up this essential functionality within Google Play Services, then bundling Google Play Services with the Play Store, Google entrenches the Play Store's dominance.

108.    The MADA bundles the Android trademark, the core functionality provided by Google Play Services, the Play Store, and its proprietary apps—those that OEMs and consumers demand, as well as those they do not—into one take-it-or-leave-it package. There is no legitimate justification for bundling these disparate products together. Further, the MADA bundle is available only to OEMs that agree to the coercive and anticompetitive provisions of the AFA or ACC.

109.    Google has also withheld revenue share payments from OEMs unless they agree to enter into a MADA with Google.

### b.    Google's MADAs Discourage the Entry of Competing App Stores

110.    The MADAs have prevented OEMs from promoting competing app stores over the Play Store via pre-installation.

111.    *First*, Google's MADAs have required OEMs to preinstall and place the Google Play Store icon on the home screen of Android devices,[7] and that no competing app store be any more

---

[6] "A [push] notification is a message that pops up on the user's device. Notifications can be triggered locally by an open application, or they can be 'pushed' from the server to the user even when the app is not running. They allow [an app's] users to opt-in to timely updates and allow [apps] to effectively re-engage users with customized content. Push Notifications are assembled using two APIs: the Notifications API and the Push API. The Notifications API lets the app display system notifications to the user. The Push API allows a service worker to handle Push Messages from a server, even while the app is not active. The Notification and Push APIs are built on top of the Service Worker API, which responds to push message events in the background and relays them to [an] application." Introduction to Push Notifications, GOOGLE, https://developers.google.com/web/ilt/pwa/introduction-to-push-notifications.

[7] The home screen appears by default when the device is active (i.e., not in "sleep mode") but no app is open. "By default, your main Home screen shows the date, weather, and a few apps," as well (footnote continued)

prominent. This placement requirement for Google Play Store, which makes it the default app store on Android, gives Google a significant advantage because users rarely change their default settings. Google's CEO, Sundar Pichai, has acknowledged that "[t]ypically," placement on the default home screen tends to lead to more usage of an app." While other app stores may be preloaded on an Android device, Google's restrictions ensure that none can acquire the Play Store's default advantage.

112.    A 2017 Google presentation on Amazon's app store described the power of the Play Store's default placement with unusual frankness: "If we were honest we would admit that most users and developers aren't consciously 'choosing' they are going with the default. If they really had to choose, how would they do that and would they choose us?"

113.    Similarly, Google stated during its negotiations with Samsung that home screen placement exclusivity "limits discoverability for Amazon [app store]." Nokia communicated to the European Commission that "[w]here a product is preloaded by default, consumers tend to stick to this product at the expense of competing products—even if the default product is inferior to competing products." Yahoo likewise said that only "a small percentage of users download applications that compete with the pre-installed choices."

114.    *Second*, Google's MADAs have required OEMs to preinstall a suite of Google proprietary apps, to make it impossible to delete or remove many of these Google apps, and to provide all of them preferential placement on device home screens or the very next screen. In 2009, Google required the pre-installation of as many as a dozen Google apps; by 2013 it required two dozen; now, Google requires OEMs to pre-install up to thirty Google apps. This conduct shields Google from competition by crowding out competing app stores and also stifles innovation by apps with functions that overlap with those of Google's preinstalled suite of proprietary apps. Google knows that its MADA bundling requires OEMs to accept many undesirable Google apps in order to get desirable ones, at the expense of consumers.

---

as a large Google Search "widget." *Change what's on your Home screen on Android*, GOOGLE, https://support.google.com/android/answer/9440648?hl=en.

115.    If Google loosened its restrictions and allowed OEMs to distribute Android devices without the Google Play Store, OEMs could theoretically opt to instead preinstall only third-party app stores (such as the Samsung Galaxy Store or the Amazon Appstore). But because Google Play Services is bundled with the Play Store, most of the top apps in those third-party stores wouldn't work. For example, without Google Play Services, any app using location and mapping functionality (e.g., ride-sharing and real estate apps), push notifications (e.g., many apps that create reminders, location-based triggers, or personalized notifications), or Google's AdMob (i.e., apps that monetize through in-app advertising) will not properly function. Google Play Services has also provided security updates and related services for Android devices, meaning that devices lacking the bundled Play Store would not receive such updates. By bundling Google Play Services with the Google Play Store, Google ensures that, while competing app stores can technically be on an Android device, the Play Store must be on the device for apps to function correctly.

### ii.    Google Shares its Monopoly Profits with OEMs and MNOs to Disincentivize the Entry of Competing App Stores

116.    OEMs of Android devices who have signed a MADA can enter into Revenue Share Agreements (RSAs), which give the OEM a "share" of Google's advertising and Play Store revenue from Android phones they distribute in exchange for complying with a long list of requirements. RSAs serve as an inducement to enter into the AFA/ACC and MADA, as both are required to be signed before an OEM may receive revenue shares. MNOs are required to sign only the AFA/ACC before entering an RSA. The agreements also require the parties to refrain from competing against Google, and refrain from any act that Google might see as a violation of its deliberately vague and frequently changing web of contracts and requirements.

117.    In 2009, shortly after the launch of Android, Google began discussing using revenue share agreements to address the "challenge" of MNOs and OEMs looking to create their own app stores. Google's goal was to "[i]ncentivize partner[s] to drive developer and user communities towards Android Market" and discourage the OEMs and MNOs from creating competing app stores.

118.    Google increased the market share of Android Market by adopting revenue share agreements that split the revenue from app purchases with certain MNOs. Google knew at the time

30

that "Mobile operators are not willing to give up the revenue stream on content distribution—Will block Market if we don't share revenue." In 2009, Google entered into revenue share agreements with various MNOs that split Android Market revenue between app developers, MNOs, and Google. Under these arrangements, app developers typically received 70% of a given purchase, while MNOs received 25%, and Google received the remaining 5% for its "operating and transaction costs." Google understood that this 25% revenue share for MNOs "Provide[d] an incentive for operators to distribute Android Market" by "offset[ing the] opportunity cost" of giving up their siloed app distribution channels. Google also gave separate revenue shares to some OEMs and MNOs through Mobile Search revenue sharing agreements and eventually gave select OEMs Android Market revenue shares.

119.    Google ultimately provided separate revenue shares to both OEMs and MNOs to help protect the increasing revenue from the Google Play Store. By 2016, for example, Google had approved RSA spend of approximately "15% of Total Search Distribution Revenue via Android."

120.    At times Google's revenue share agreements with OEMs have outright prohibited the preloading of competing app stores, apart from OEM or MNO-branded stores in some cases. Google knew that these revenue shares would work with the MADA's default placement requirement to ensure that any OEM or MNO-branded app stores would pose no real competitive threat to the Play Store, foreclose third-party app stores from the vital distribution channel of preloading, and give the Play Store effective exclusivity. For instance, a 2014 email from a senior Google executive regarding negotiations with an OEM stated that "MADA gets us default home screen placement for Play store" while the "revenue share deal gets us exclusivity for Play store (but 'Company may distribute its own or its customers' branded Alternative Store'[)]." In fact, the RSA 3.0 agreements offer OEMs the opportunity to enroll their devices in three different tiers. For the "premier tier," which offers the highest revenue share, an OEM "may not install any app store on their device other than Google Play."

121.    But, by mid-2019, Google recognized that "Android dynamics changed" and that "Play revenue" faced "higher exposure." To meet this challenge, Google required a multiprong

approach which included: (1) offering substantially higher revenue shares through a new tier called "Google Forward"—which required Google Play Store exclusivity; (2) a separate, even more costly agreement, with the primary threat to Google's app distribution monopoly—Samsung, which Google initially dubbed project "Banyan,"; and (3) pay-offs to key app developers that might work with Samsung, or from another app distribution competitor, which Google called project "Hug."

### 5. Google Disincentivizes the Creation of Competing App Stores with Payments to and Restrictive Contracts with Potential Competitors

#### i. Google Shares its Monopoly Profits with OEMs and MNOs to Disincentivize the Entry of Competing App Stores

122.  Google understands that dominating the Android App Distribution Market is critical to retaining monopoly profits from app distribution. As discussed above, though Google's exclusionary conduct covers all the dominant OEMs and MNOs that build or distribute Android devices, in recent years, Google recognized that one OEM, Samsung, was "the only OEM with sufficient share to plausibly build its own store in key Play markets." A March 2019 Google Play presentation identifies "incorporat[ing] Play protections into OEM rev share contracts (primarily Samsung)" as a solution to risks posed by alternate stores to Play's business.

123.  Google felt deeply threatened when Samsung began to revamp its own app store, the Samsung Galaxy Store. Historically, Samsung's app store had performed poorly, and Samsung had sought out deeper integrations with the Play Store to distribute Samsung-specific apps. Google estimated that users spent only 3% of the time on the Samsung Galaxy Store that they spent on the Google Play Store, and that the Galaxy Store did not cannibalize the Play Store's revenue. But the Google team feared Samsung's ability to add "exclusive hit-titles," such as high-end games, on the Galaxy Store. In 2018, Samsung partnered directly with top game developer Epic to launch the mobile version of Epic's ultra-popular game Fortnite exclusively on the Samsung Galaxy Store. Epic's bypassing of the Play Store led to lost revenues that Google estimated at $300 million. This exclusive agreement threatened Google on multiple fronts. *First*, it represented an attempt by Samsung to build out its app store by competing on substantially more generous terms for top app developers. *Second*, Samsung was allowing Epic to launch not merely an app in its store, but also

1    an app installer that would allow Epic in the future to offer content directly to its customers.

2        124.    Samsung also pursued exclusive deals with other popular app developers such as

3    Riot Games, Activision, and Blizzard. At the same time, Samsung indicated its intent to place the

4    Samsung Galaxy Store on the home screen of its next generation of devices, threatening the Play

5    Store's exclusive home screen placement advantage.

6        125.    Google saw any nascent competition from the Galaxy Store in Android app

7    distribution as a threat it needed to preemptively quash. It immediately launched multiple

8    coordinated initiatives designed to block the emergence of a competing Galaxy Store by preventing

9    Samsung from developing any meaningful app distribution relationship with developers or end

10   users. One such initiative, Project Hug, focused on "relationship with at risk top dev[elopers]" and

11   attempted to cement the dependence of popular mobile games on Google's proprietary ecosystem

12   to discourage any dealings with Samsung. In parallel, a second set of initiatives aimed at convincing

13   Samsung to abandon its "stated desire to 'own customer relationship.'" Project Banyan—later

14   renamed Project Agave—was a direct attempt to pay Samsung to abandon relationships with top

15   developers and scale back competition through the Samsung Galaxy Store. Google viewed these

16   projects as an integrated approach to eliminating the threat of more developers following Epic's lead

17   by either partnering with Samsung or distributing directly to consumers through sideloading (see

18   Figure 4). Project Hug and Project Banyan/Agave were complementary, self-reinforcing, and

19   balanced against each other. When discussing the best ways to "defend[] Play," Google assessed

20   which project would provide the "best ROI" and "what the best use of that dollar [was]."

21       126.    Google was aware that if Samsung actually saw Google's returns from control of the

22   Google Play Store, it would be harder to keep Samsung from competing in the app distribution

23   market. Google employees repeatedly emphasized the need to "avoid divulging Play business

24   economics and YoY growth" to OEMs, including Samsung. As a practice, Google generally prefers

25   to negotiate a fixed dollar amount with OEMs as opposed to agreeing on a revenue share percentage,

26   to avoid the "optics of a small percentage" figure and the substantial "financial impact of small

27   percentage point increases." Google foresaw that Samsung would want a Play Store revenue share

28

percentage as opposed to a lump sum. As a countermeasure, Google prepared to combine Samsung's Search revenue share with its Play Store revenue share in order to "obfuscate Play business margins" when it presented its offer to Samsung. Given the information asymmetry between Samsung and Google, Samsung is dependent on Google's declaration of its Play Store revenues to calculate the revenue share that it is entitled to, pursuant to its Revenue Share Agreement.

### ii. Google Bought Off Key App Developers to Stifle Competition in the Android App Distribution Market

127.    To support Projects Banyan and Agave, Google also bought off key app developers to deter them from making their apps available outside the Google Play Store, either through direct distribution or through competing app stores. To do so, Google shared its monopoly profits by providing these app developers in-kind services and adding distribution restrictions through an addendum to the DDA. Google coined this strategy Project Hug, aptly derived from "Bear Hug."

128.    Figure 4 depicts Google's buyoffs of Samsung and the app developers as two sides of its overarching scheme: "Hug reduces the risk of the Samsung scenario, but [without Projects Banyan and Agave] significant risk remains."

**Figure 4**



129.    Google feared that key app developers might have strong enough relationships with customers and enough brand recognition to attempt to distribute their apps outside the Play Store— either through launches with other app stores or through sideloading. If they did so, smaller developers might follow, and consumer interest in alternative app stores or consumer comfort with sideloading might increase as a result.

130.    As a direct consequence of Epic bypassing the Play Store with its Fortnite mobile launch in 2018, Google anticipated that the potential concentration of a few top app developers could "create[] disintermediation threats to Google Play and Android." Google quantified the "downstream impact" of Epic's decision as "550M (up to $3.6B) potential revenue loss if broad contagion to other developers." For Google, the worst-case scenario was that "Fortnite may legitimize 'Samsung' store & 3rd party stores; fragmenting app distribution on Android." This threat is what Google described internally as "contagion"—to Google, competition in app distribution is a

1  virus to be eliminated.

2      131.    As shown in the Google internal presentation excerpted in Figure 5, Google viewed

3  its Agave, Hug, and other projects, as well as its extension of its anticompetitive IAP tie to

4  subscription streaming and major dating apps, as parts of a unified strategy to lock key app

5  developers into the Play Store and combat the "[g]rowing reach of 3P [app] stores."

6  **Figure 5**



7

8

9

10

11

12

13

14

15

16

17

18

19      132.    According to Google, the Hug program succeeded in keeping another major app

20  developer, Riot, from following Epic's lead and launching an app that would be distributed outside

21  the Play Store. Google saw Project Hug's overarching purpose as an "insurance policy" to protect

22  Play Store revenues by "De-risking 3P[third party] stores" while allowing Google to "hold the line

23  on 30%." By the end of 2020, approximately 20 top app developers had agreed to Google's buyoff.

24      133.    For example, Activision Blizzard King ("ABK") was a developer that signed a

25  Project Hug deal. As the developer of mobile games such as Candy Crush and Call of Duty, ABK

26  "had the highest estimated spend by users of all of the Project Hug developers." ABK was "quite

27  vocal [in] complaining about Google Play's 30 percent fee," and it was communicated to Google

28

that ABK was considering the option of starting its own Android app store. Google estimated that it faced a risk of losing $243 million per year if ABK were to pull its content from the Google Play Store. Google internally discussed this risk, as well as the possible "contagion risk" if ABK were to launch its own store and "attract[] more content from other developers." Google then offered ABK a Project Hug deal for $360 million.

### 6.    Anticompetitive Effects in the Android App Distribution Market

134.    Google's anticompetitive conduct forecloses competition in the Android App Distribution Market, causing anticompetitive harm and antitrust injury to consumers, app developers, and competing Android app stores. Google's anticompetitive practices stifle innovation, limit choice, raise prices, depress output, and reduce developer profits.

135.    Consumers participate directly in the market for Android App Distribution (as direct purchasers), and Google's anticompetitive restrictions are aimed squarely at and cause harm in that market. Irrespective of whether some of Google's restraints are more directly imposed on other market participants, the harm to consumers is an inevitable and primary intended consequence: Google places restraints on OEMs and developers specifically to prevent consumers from using alternative app distribution channels—which the restrained parties would otherwise be well-positioned to create—and to impose its supra-competitive commission on consumers.

136.    Google's anticompetitive conduct harms consumers by, inter alia, impeding competition among app distributors, which would otherwise innovate new models of app distribution and offer consumers alternatives to the Google Play Store. Consumers are limited to the Play Store, where Google controls which apps are featured, identified, or prioritized in user searches. For example, Amazon created an innovative new model of app distribution and monetization through Amazon Underground, which allowed Amazon to pay developers directly based on the amount of time that consumers spent interacting with apps. However, Amazon Underground was eventually shuttered because of Google's restrictions on the distribution of app stores (including its restrictions on sideloading). Loss of such innovation and choice directly harms consumers in the Android App Distribution Market.

CLASS ACTION COMPLAINT

137.    Consumers are also harmed by Google's anticompetitive practices by way of increased prices and reduced output. As explained above, Google imposes a supra-competitive commission of up to 30% on the purchase price of apps sold through the Google Play Store, which is much higher than would exist in a market unimpaired by Google's anticompetitive conduct. For example, in the face of competition, Google charged substantially lower fees on its Chrome Web Store at only 5% of each app download. Google's supra-competitive taxes raise prices for app developers and consumers and reduce the output of mobile apps and related content by depriving app developers incentive and capital to develop new apps and content.

**B.    Google Unlawfully Maintains its Monopoly in the Android In-App Payment Processing Market**

138.    Google coerces developers into exclusively using its services in the separate market for Android in-app payment processing for digital content, hereafter referred to as the IAP Processing Market.

**1.    Google Has Unlawfully Tied Google Play Billing to the Google Play Store**

139.    As a condition of distribution through the Google Play Store, Google requires app developers to exclusively use Google Play Billing, Google's in-app payment processor, to process all in-app purchases of digital content. Digital content means all products and services consumed in the app as opposed to tangible goods and services consumed outside the digital environment, which must use a payment processor other than Google Play Billing.

140.    Google requires app developers to enter its standardized DDA as a condition of having their apps distributed through the Google Play Store. The DDA unlawfully ties use of Google's in-app payment processor to distribution through the Google Play Store. It also constitutes an unlawful exclusive-dealing arrangement.

141.    Under Section 3.2 of the DDA, developers have been required to enter into a separate agreement with Google Payment, a Google subsidiary that is not part of Google's Play Store business unit, to use Google Play Billing for all digital content sold in apps downloaded through the Play Store.

142.    Further, Section 4.1 of the DDA has required that app developers comply with

38

Google's Developer Program Policies. Those policies require that "1. Developers charging for apps and downloads from Google Play must use Google [Play Billing] as the method of payment. 2. Play-distributed apps must use Google [Play Billing] as the method of payment if they require or accept payment for access to features or services, including any app functionality, digital content or goods." By contrast, Google's policies require that developers may not use Google Play Billing to process payments "for the purchase or rental of physical goods (such as groceries, clothing, housewares, electronics); for the purchase of physical services (such as transportation services, cleaning services, airfare, gym memberships, food delivery, tickets for live events); or a remittance in respect of a credit card bill or utility bill (such as cable and telecommunications services)." "[F]or physical products and services," Google's policies require a payment processor other than Google Play Billing.

143.    Furthermore, for payments subject to Google's requirement to use Google Play Billing, developers are prohibited from "lead[ing] users to a payment method other than Google [Play Billing]." This provision bars developers from linking to a website or other service that would process payments more cheaply. The restrictions have been comprehensive: "Within an app, developers may not lead users to a payment method other than Google Play's billing system. This includes directly linking to a webpage that could lead to an alternate payment method or using language that encourages a user to purchase the digital item outside of the app."

144.    Together, these provisions make Google Play Billing the only in-app payment processor that an Android developer may use for digital content within Android apps. As explained more fully below, Google's contractual tie of Google Play Billing to Google Play Services illegally maintains its monopoly in the IAP Processing Market.

145.    The tie creates enormous profit margins for the Play Store, even if one considers only direct revenue and not the various other ways Google profits from Android. In 2019, the Play Store collected $11.2 billion in overall revenue and booked $8.5 billion in "Gross Profit" and $7 billion in "Operating Income"—an operating margin of over 62% that combines IAP revenue with Play Ads revenue.

**2.    Google Uses Its Unlawful Tie to Maintain its Monopoly in the IAP Processing Market**

**i.    The IAP Processing Market is a Relevant Antitrust Market**

146.    There exists a relevant antitrust market for in-app payment processing services for digital content within Android apps, the IAP Processing Market.

147.    Payment processing services consist of software employed by merchants that performs the necessary steps to verify and accept (or decline) a customer's purchase (or attempted purchase). Payment processing services frequently provide additional customer-facing functionalities such as invoicing, payment history, and refund processing.

148.    The IAP Processing Market comprises (a) Google Play Billing and (b) alternative payment processing services that, absent Google's illegal tie, Android developers could employ to process payments for in-app digital content. Such competitors or potential competitors include PayPal, BrainTree, Adyen, WorldPay, Chase Limited, and proprietary payment processing software written by app developers. These alternatives would enter the IAP Processing Market, but for Google's anticompetitive tie. Indeed, Google is now forcing these alternatives *out* of the market as to digital streaming services, to which Google is currently extending its unlawful tie.

149.    The ability to make quick, seamless purchases within an app itself is critical to the consumer's experience and to the likelihood of purchase. If a consumer were required to purchase digital content only outside the mobile app, that user might simply abandon the purchase or stop interacting with the app altogether. And in-app purchases are critical to app developers: the revenue generated from in-app purchases is substantially greater than the revenue generated by pay-to-download apps.

150.    Accordingly, app developers seek to make their in-app purchase experience as frictionless as possible. Users similarly seek to consummate in-app transactions with the least interruption of their use of the app. A payment processing product that requires the user to exit an app to complete a transaction cannot substitute for one that consummates transactions within the app. The more friction and time a payment requires, the less likely a consumer is to complete the transaction. Developers and consumers alike would not regard a payment processing product that

40

required exiting the app as reasonably interchangeable with payment processors that support in-app payment.

151.    In particular, purchasing through a developer's website is not a substitute for in-app payment processing. Not only would this require the user to exit the app, but Google's policies prohibit developers from referring or directing users to websites for payment outside the app environment.

152.    Moreover, the IAP Processing Market is distinct from app distribution, as they are separate products and separate demand exists for each.

153.    In other digital ecosystems, payment and distribution services are routinely sold separately. In fact, Google already allows this within the Android mobile ecosystem: Android app developers may use a third-party payment processor like Ayden, PayPal, and Braintree for in-app purchases of physical products and out-of-app services such as those offered through Amazon, Airbnb, and Uber.[8] For in-app purchases of digital content, however, app developers must use Google Play Billing as their exclusive payment processor if they wish to distribute their apps through the Google Play Store.

154.    Moreover, tying together these two distinct services—app distribution and in-app payment processing—is not technologically necessary. Third-party payment companies operate safely and effectively in other digital and real-world ecosystems, including, for example, desktop computers and in-app purchases of physical goods. Companies like PayPal and Braintree offer payment processing at a significantly lower price than Google Play Billing. These major payment processors have all found a competitive equilibrium at the same fee (to the cent), 2.9% + 30 cents, which is ten times lower than Google Play Billing's 30% supra-competitive commission. These companies also compete on various dimensions of convenience, speed, security, privacy, and customer service. Google, in contrast, faces no competitive pressure to provide consumers quality customer service or meaningful privacy protections from its own data harvesting.

---

[8] The developer may also use a proprietary payment solution.

155.    Android developers often choose to use a competitor, rather than Google's offerings, for their payment processing where Google's enforcement practices permit, as with in-app purchases of streaming services.[11] Google's competitors typically offer far lower costs, more favorable terms of service, more timely payment to merchants, more payment method options (e.g., Apple Pay, Venmo, bank transfer), and more freedom to set prices than Google offers. These competitors' products could readily be adapted (or continue to be permitted) for use in the IAP Processing Market, i.e., for in-app purchases of Android digital content. Google's unlawful contracts and policies are the primary reason these competitors have negligible market share right now. Third-party payment processors stand ready to compete, but Google's illegal tying arrangement prevents them from doing so.

156.    Consumers are largely unaware of Google's tie, face high information costs in learning about it, and do not provide informed consent to it when purchasing an Android device. Further, consumers who purchased Android devices prior to Google's September 2020 announcement to developers that streaming services would be forced to use Google Play Billing—which is far from a forthright disclosure to consumers of Google's monopolistic commission and foreclosure of competition—could not possibly have known that Google's tie would affect their future purchases of streaming service subscriptions and content from Google Play apps.

157.    Insofar as the IAP Processing Market is or may be a two-sided market, Google's anticompetitive tie harms both consumers and developers. Google's restraints also reduce overall output by eliminating alternative avenues for IAP payment processing that consumers and developers would otherwise use. Rather than competing on the merits, and creating more efficient, innovative, or less expensive payment processing, Google simply blocks its competitive threats.

### ii.    The Relevant Geographic Market for IAP Processing is Canada

158.    The geographic scope of both the tying (Android App Distribution) and tied (IAP Processing) Markets is Canada.

### iii.    Google Has Monopoly Power in the IAP Processing Market

159.    Google possesses monopoly power in the IAP Processing Market. It enjoys a market

42

share exceeding 90% (consistent with Google's market share for Android app distribution), and it can set prices and exclude competitors at will.

160.    Google's monopoly power in the IAP Processing Market is a result of its monopoly power over Android app distribution combined with its unlawful contractual requirement that Android app developers distributing on the Play Store must use Google Play Billing to process payments for digital content.

161.    By its nature, this monopoly power is durable, because Google's unlawful tie of Google Play Billing to the Google Play Store, and its monopoly power in the Android App Distribution Market, deter any significant entry into the market. Together, these pose insurmountable barriers to entry.

162.    Android app developers and consumers have no meaningful alternative to the Google Play Store, and Google's unlawful tie of the Google Play Store to Google Play Billing means they have no meaningful alternative to Google Play Billing either. App developers and consumers thus have no choices in the Android App Distribution Market to discipline Google's misconduct and overreach in the IAP Processing Market.

163.    App developers cannot feasibly use proprietary payment processing solutions as they have no workarounds to Google's policies. Developers that have attempted to compete with Google Play Billing by offering their own payment services for in-app payment processing have been removed from the Google Play Store (as was Epic Games' app Fortnite). The threat of removal from the Google Play Store prevents other app developers from attempting the same. Any developer that wishes to distribute an app to Android users is therefore forced to use Google's app distribution and in-app payment services, or it will lose efficient access to nearly all the users of Android devices.

### iv.    Google's IAP Processing Tie is Not Necessary to Incentivize its Investment in the Play Store or Android

164.    Google's tie is not necessary for it to reap significant profits from the Google Play Store and the Android ecosystem, nor for it to continue to invest in the quality of these products. Google's core business model for Android is to collect detailed personal data from Android users and monetize that data through targeted advertising. Part of "the core assignment of the Play team

43

… is defense of Android (& thus Search revenue)," a longtime Google engineer wrote in 2020. As early as 2010, Google's CEO claimed that "Android is likely to be financially successful to Google without even any of the applications that are possible." This was because of Google Search revenues Android would generate: "Android puts smart phones in more peoples [sic] hands…. What do they do when they get these phones? Search…. So this is how Android is profitable for Google." The CEO was correct: less than a decade later, "Search made up ~78% of overall [Android] Search and Play 2018 revenues," which totaled some $32 billion.

165.     Google earns substantial revenues from other digital advertising as well: the display advertising it sells on third-party sites; ads within the Google-owned-and-operated apps it mandates that OEMs preinstall; ads within the Play Store; and Google's AdMob, which is among the most popular services app developers use to monetize through advertising. The latter two earn Google billions of dollars solely from or via app developers, and app developers spend billions on Google's other advertising channels to reach consumers.

166.     Nor is the tie necessary to prevent "free riding" by app developers as to distribution via the Google Play Store. In fact, Google's current model encourages free riding. Among the apps that benefit from being on the Google Play Store but do not sell digital goods are many categories of very valuable commercial apps such as, for example, those used by banks and other financial institutions, brokerages, insurance companies, and real estate services to interact with customers, in addition to those apps that sell billions of dollars of physical goods (e.g., Amazon), services (e.g., Uber), or advertising (e.g., Facebook). Google could elect to charge a reasonable fee for the Google Play Store's distribution services, but it does not. Instead, it reaps a monopolistic windfall from Android in-app payments—a commission overwhelmingly paid by consumers of a small subset of highly popular apps, most of them games, that use an in-app payment monetization model.

167.     The tie creates enormous profit margins for the Play Store, even if one considers only direct revenue and not the various other ways Google profits from Android. In 2019, the Play Store collected $11.2 billion in overall revenue and booked $8.5 billion in "Gross Profit" and $7 billion in "Operating Income"—an operating margin of over 62% that combines IAP revenue with Play

Ads revenue.

### 3. The Origin and Rates of Google's Supra-Competitive Commission Illustrate that Google Sets Prices at Will

168.   The bounds of Google's in-app payments policy, and the commission rate Google charges on IAP processing, are not the result of the technical interdependence of Android app distribution and in-app payments, competitive pressure, or other commercial considerations. Rather, they are entirely a function of Google's power in the marketplace.

169.   Google's monopoly power in the IAP Processing Market is evident from its ability to unilaterally set the price for its services at will, unconstrained by competitive forces.

170.   Google has acknowledged that its monopolistic profits from Google Play Billing are derived not from a fair exchange of value with developers and consumers, but rather from its ability to hold the line on its supra-competitive commission by tamping down competition in the Android app distribution and IAP processing markets. When contemplating Google's commission, one employee asked "[w]here does the 30% rev share number come from," and another responded, "pretty sure Steve Jobs just made it up for itunes."

171.   Similarly, Google appears uncomfortable with its own exploitative commission: "We want to feel good about the rev share that we charge—have it make sense to us. And it feels like there's discomfort with what we are charging." Google's internal meeting minutes further note, "[W]e would probably have a stronger backbone if we felt secure about the value exchange."

172.   By contrast, in the Google Chrome Web Store, Google's app store for its personal computer version of the Chrome browser—where Google faces competition—Google charges a commission of only 5% per transaction for consumer purchases of digital content.

173.   Similarly, when determining a viable price for Google's payment processing for subscription streaming services accessed not through Android apps but through Google Search, Google staff suggested that a 5% commission would be appropriate due to considerations such as competition from Stripe, noting that developers "can already use payment platforms like Stripe at 2-4%." Google even discussed branding its billing services differently (as "GPay" instead of "Google Play") in order to limit "contagion."

45

174.    In its payment policies, Google offers no rationale for why the payment services it provides for digital content justify its supra-competitive 30% fee, nor any rationale for why sales of physical content are exempt from its supra-competitive fee.

### 4.    Google's Unlawful Tie Has Led to Anticompetitive Effects in the IAP Processing Market

175.    Google Play Store has a monopoly in the Android App Distribution Market. By requiring that apps purchased through the Google Play Store also use Google Play Billing for the purchase of digital content within apps, Google has illegally engaged in tying and exclusive dealing, extending its monopoly to the IAP Processing Market. Google's anticompetitive conduct has demonstrable anticompetitive effects on the IAP Processing Market that harm competition and injure consumers by, among other things, raising prices for in-app purchases.

176.    Google could not maintain this extravagant commission in a competitive market free from Google's illegal tying, exclusive dealing, and other anticompetitive conduct. The fee is an order of magnitude higher than fees for platforms in which there is competition for electronic payment processing.

177.    Google harms consumers by preventing information flows regarding the availability of lower-priced payment options for in-app purchases and app subscriptions. Google's policies gag app developers from efficiently informing consumers about better deals. Developers whose only relationship with their customers is through their app are effectively foreclosed from providing this information. Communication through an app is low-cost and efficient. But Google stops any such communication that threatens its IAP processing monopoly, thus distorting the competitive process and harming consumers, many of whom are unable to learn about better deals.

178.    There are no procompetitive efficiencies from Google's tie of distribution and payment processing services that outweigh the harm to consumers. Indeed, all market participants are harmed by Google's forced intermediation of in-app payments.

179.    While Google defends the tie by citing security concerns, security is equally important to payment systems for both digital and physical content, and yet Google locks in Google Play Billing only for digital content. Further, there are many highly secure and reliable payment

46

processing systems that are used on computers. If Google were truly concerned about security, it would simply require that payment processors use reasonable technical security protocols. Instead, Google's internal strategy around pricing and policy for in-app payments reveals that its invocation of security concerns is simply a public-relations strategy—a means of justifying Google's anticompetitive conduct as opposed to a genuine security concern.

180.    There are no welfare-enhancing or otherwise legitimate justifications for this tie. Any security or consistency that Google can offer consumers in the payment processing market can still be offered in a competitive market, at a competitive price. Nor does Google need to monetize the Play Store in this manner in order to maintain the Android ecosystem at large.

181.    In short, Google has used its monopolistic control over the Android App Distribution Market to force developers to use Google Play Billing as their exclusive in-app payment processor. Google thus deprives consumers of choice among in-app payment options and of the benefits of competitive pricing and innovation in payment services for in-app purchases of digital content.

182.    Canadian consumers (including natural persons) are direct purchasers of services from Google in the Android App Distribution Market and in the IAP Processing Market. Consumers are direct purchasers of apps and in-app digital content sold through the Google Play Store. When consumers purchase Android apps, they do so directly from the Google Play Store and pay Google directly, using their credit card or other payment method. When consumers purchase in-app digital content, they do so through the Google Play Store, using the pre-established payment streams set up when purchasing that app or other apps on the Play Store. When consumers purchase the in-app digital content, they pay Google directly.

183.    Consumers must enter into a contractual agreement with Google to use Google Play Billing. In its interlocking series of consumer contracts and terms (which it unilaterally changes at will), Google does not disclose its huge IAP commission of up to 30%, nor does it disclose its foreclosure of competition in the IAP Processing Market. On the contrary, Google's fee disclosures state that it charges $0 for nearly all transactions, and fractions of a percentage point for others. This is despite the fact that, as a matter of law, consumers as direct purchasers pay the entirety of Google's

IAP commission. Insofar as Google makes any disclosure of its IAP processing tie and foreclosure, nearly all consumers are unaware of them and have not knowingly consented to them.

184.    The tie is imposed in the antitrust market where consumers participate and are harmed—the IAP Processing Market.

## C.    Google Engaged in Unfair and Deceptive Conduct

185.    In addition to the anticompetitive and monopolistic conduct described above, Google has repeatedly engaged in unfair, fraudulent, and/or deceptive conduct regarding the Google Play Store. This includes, *inter alia*, numerous statements Google has made about the Google Play Store that have had, and continue to have, the capacity, tendency, or effect of deceiving or misleading consumers and/or app developers.

### 1.    Google Has Made False or Misleading Statements About Sideloading Apps

186.    As explained in more detail above, Google uses a series of technological barriers and pretextual warnings that are designed to prevent users from sideloading (i.e., directly downloading) Android apps and app stores onto their Android devices. Google's website promotes the misleading and overbroad premise that it is harmful to download apps from "unknown" sources, which includes every source other than the Play Store. In particular, Google's website states under the heading *Download apps from other sources*: "Important: If you download apps from unknown sources, your phone and personal information can be at risk. Your phone could get damaged or lose data. Your personal information could be harmed or hacked."

187.    Google's pretextual security claims regarding the dangers of sideloaded apps have the capacity, tendency, or effect of deceiving or misleading consumers and/or app developers. Google acknowledges that the security settings and warnings associated with sideloading limit even mainstream, non-malicious apps and app stores, such as the Amazon Appstore and Fortnite, from reaching Android users. Yet Google makes no effort to differentiate harmful apps and app stores from the rest and instead labels all non-Play Store apps and app stores as harmful.

188.    In addition to posting warnings on its website, Google takes the following steps when users attempt to sideload apps and/or app stores to their devices:

a.  it displays an ominous warning that the installation file "can harm your device;"

b.  it blocks the attempted download and states that "your phone is not allowed to install unknown apps from this source," presenting the user with two options only—"Cancel" or "Settings"—with no indication that installation is possible through the "Settings" option; and

c.  it warns the user that his "phone and personal data are more vulnerable to attack by" the "unknown app," and requires the user to select a feature by which he agrees that he is "responsible for any damage" to the phone "or loss of data that may result" from the installation, warnings that are designed to scare the user into abandoning the attempt.

In other contexts, Google labels sideloaded apps and app stores like Aptoide "UNSAFE."

189.    Google represents to users that it is looking out for their best interests. On its website, Google claims that it "analyzes every app that it can find on the internet" and categorizes a subset of them as "Potentially Harmful Applications," or PHAs. If it finds a PHA on a user's device, it directs actions against the PHA or automatically disables the PHA for the user. Additionally, it tells users that Android is "secure to the core," and that "we guard each app at the operating system level, so other apps won't snoop on what you do."

190.    These representations would lead users to believe Google when it displays warnings that the apps or app stores they are attempting to sideload are "unknown," harmful, and could damage their devices. Despite its claims of Android's superior security, Google purposefully deceives users by presenting warnings that falsely describe highly popular apps from well-known developers as an "unknown app," which gives the user the false or misleading impression that apps and app stores downloaded from any source other than the Play Store are PHAs or that they are otherwise harmful.

191.    Google displays these misleading warnings in order to ensure that users exclusively use the Play Store to download apps and thus keep users within Google's walled garden. Google's

statements regarding the dangers of sideloading were knowingly false when made.

**2.    Google Has Made False or Misleading Statements About "Openness"**

192.    In 2008, Google launched the Google Play Store's predecessor, Android Market, which at the time offered fewer than fifty apps. Android Market was distributed as part of the open-source Android OS, and it became the de facto app store on early Android devices. Google described Android Market as "an open content distribution system" similar to YouTube. In August 2008, Google informed the public through its Android blog: "We chose the term 'market' rather than 'store' because we feel that developers should have an open and unobstructed environment to make their content available."

193.    Early on, Google had a suite of partnership agreements with OEMs and MNOs. These partners negotiated with Google for different degrees of control over Google's proprietary app pre-loading, app placement, and user experience. OEMs had bargaining power because they chose which OS to install on devices and whether to distribute Google's proprietary apps, including Android Market. MNOs had bargaining power because they could customize devices, preinstall apps and app stores, and offer "direct carrier billing" for Android Market purchases, which allows purchases to be charged to a user's mobile phone bill.

194.    Google assured MNOs, OEMs, and consumers that it would operate Android Market as an "open system" for the benefit of Google's partners and app developers. For example, in a November 2009 communication with a Samsung representative, a high-level Google executive pledged:

> We certainly believe that a single "app store" is an essential piece of the strategy to make the overall Android ecosystem successful, and we are putting significant investment into making Android Market that single \*open\* distribution system. That will maximize distribution and revenue to developers, maximize the applications available to every Android-compatible device, and drive value for the operators (as we will offer revenue-share). Google operates Android Market as a revenue-neutral service—we do not seek to profit off of application sales, and we invest in Market because it is essential to the open ecosystem.

195.    Google also pledged to consumers that the Android source code was an "open-source

platform" that was "available for anyone to view, download, modify, enhance, and redistribute."

196.    Google understood early on that its promise of Android's "openness" and revenue sharing largesse were key to securing critical mass for Android Market, and that it could later use that dominance to control the Android ecosystem. Google documents from this period indicate that Google's "openness" commitments to OEMs and MNOs were knowingly false when made and were material to Google's obtaining a monopoly in app distribution.

197.    Google promised repeatedly that Android would be the basis for an "open" ecosystem in which industry participants could freely compete, and, in Google's words, have "[f]ull control of [their] brand and business." For instance, in August 2008, Google informed the public through its Android blog that developers should have "an open and unobstructed environment to make their content available." In a 2009 presentation, a Google executive answered the question "Why don't we license Android?" by stating, "We need the highly-fragmented mobile industry [to] adopt Android. You can't beat free." The executive posed another question, "Why not take a rev-share on Market?" The answer: "We don't have a dominant market position right now."

198.    In 2010, Google stated that "Google was historically seen as a threat to operators [MNOs], [in that] giving up control was a key component of operators adopting Android." But, "If we gave it away, how can we ensure we get to benefit from it?" The answer lay in controlling the app store—Android Market and, later, the Google Play Store. "We created the first app store for Android and it got critical mass quickly. The store now has value and partners want access to it because of the number of apps available." Google intended to "Own the ecosystem [it] enabled" by using the app store.

199.    Looking back in 2019, Google recognized that: "[t]he novelty of smartphones and apps, combined with a material utility advantage relative to the Web, gave Apple and Android an opportunity to define new *closed* Internet ecosystems. These new closed ecosystems centralized Content distribution via app stores…[and] payments via app store services" (emphasis added).

200.    To own the ecosystem, Google intended to "[s]et the rules." Having driven adoption of Android by promising an open platform outside its control, Google intended to close the

51

1    ecosystem once it had the power to do so.

2        201.    Closing the ecosystem also empowered Google to claim a larger share of the revenue

3    generated through the distribution of Android apps through its app store. To do this, however,

4    Google had to renege on its repeated assurances that Android Market operated as revenue-neutral—

5    promises that had been a key factor in driving adoption of Google's app store.

6        202.    Google understood that its ostensible "partners" would not be happy with its bait-

7    and-switch tactic. Nonetheless, Google launched the branded Google Play Store in 2012 and ran it

8    for its own benefit, not for that of the "Android ecosystem."[9] Breaking its promises to operate the

9    Play Store in a revenue-neutral manner for the benefit of the ecosystem allowed Google to capitalize

10   on the lucrative revenue stream coming from app purchases.

11       203.    Google operates the Play Store as a closed system despite its repeated representations

12   that such a system would be open for the benefit of Google's partners and app developers. Google's

13   knowingly false statements regarding its intention to keep the Play Store and its predecessor open

14   had the capacity, tendency, and/or effect of deceiving or misleading consumers and app developers.

15       **3.    Google's False and Misleading Statements and Conduct Regarding Google Play Billing**

16

17       204.    As described more fully above, Google tied Google Play Billing to use of the Google

18   Play Store in order to force users and developers to use Google Play Billing to process payments for

19   all digital content purchased (i.e., "in-app purchases") and thus pay Google's supra-competitive

20   commission. Even when lower-priced alternatives are available, such as through an app developer's

21   website, Google gags app developers by prohibiting them from informing their users of the other

22   lower-priced options.

23       205.    Google also made false and misleading statements regarding its in-app purchase

24   billing policies. Google's policy effective prior to September of 2020 expressly exempts from its

25   Google Play Billing requirement cases where "Payment is for digital content that may be consumed

26   _____
     [9] Jamie Rosenberg, *Introducing Google Play: All your entertainment, anywhere you go*, GOOGLE

27   OFFICIAL BLOG (March 6, 2012), https://googleblog.blogspot.com/2012/03/introducing-google-play-all-your.html.

28

outside of the app itself (e.g. songs that can be played on other music players)." On September 28, 2020, however, Google announced that effective September 30, 2021, it would require content streaming services such as Netflix and Spotify to use Google Play Billing for their subscription services. Google publicly claimed that this was simply a "clarification" of the intention of a "long standing policy" in response to "feedback that our policy language could be more clear regarding which types of transactions require the use of Google Play's billing system, and that the current language was causing confusion." Google also claimed that "this isn't new" and that it had "*always* required developers … to use Google Play's billing system if they offer in-app purchases of digital goods, and pay a service fee from a percentage of the purchase." Google's statements about its prior billing policies were false and misleading with respect to streaming services, which were expressly exempt under the prior policy.

206.    Consumers have been harmed as a result of Google's unfair conduct. They are harmed because Google forces them to pay a supra-competitive commission of up to 30% to purchase any app other than those that are "free-to-download."

207.    Furthermore, Google actively gags app developers by prohibiting them from informing their consumers about the 30% commission and the possibility of obtaining lower prices through alternative channels. It does this by preventing information flows regarding the availability of lower-priced payment options for in-app purchases of digital content and app subscriptions. Google's policies gag app developers from efficiently informing consumers about better deals, meaning developers are forced to incur significant costs to communicate through other means. Developers whose only relationship with their customers is through their apps are effectively foreclosed from providing this information. Communication through an app is low-cost and efficient. But Google stops any such communication, thereby harming consumers, many of whom are unlikely to learn about better deals.

208.    In addition, Google's conduct has harmed consumers by depriving them of the potential benefits of true competition in app distribution, including better services like enhanced app discovery features or improved data security. The effects of Google's supra-competitive

commission impede developers from researching, developing, and bringing to market innovative new apps, resulting in further lost profits for them and less innovation and choice for consumers.

209.    Google's conduct has also impeded competition among app distributors, who would otherwise innovate new models of app distribution and provide consumers with alternatives to the Google Play Store. This limits consumers' ability to discover new apps of interest to them. Consumers are left to search among millions of apps in one monopolized app store, where Google controls which apps are featured, identified, or prioritized in user searches.

210.    Google, in other matters, has defended its tie of Google Play Billing by citing security concerns, but those assertions are false and misleading. Security is equally important to payment systems for both digital and physical content, and yet Google requires the use of Google Play Billing for digital content only. If Google were genuinely concerned about security, it would simply require that payment processors use reasonable technical security protocols—similar to the highly secure and reliable payment processing systems used on personal computers.

211.    Instead, Google's internal strategy around pricing and policy for in-app payments reveals that its claimed security concerns are simply a public-relations strategy.

212.    Consumers have actually and reasonably relied on Google's actions and false representations to their detriment. Moreover, Google knows that its conduct is harmful to developers and users. As such, Google's false representations have had and continue to have the tendency or effect of deceiving or misleading consumers or app developers.

## V.    CLASS ACTION ALLEGATIONS

213.    Plaintiff brings this proposed class action for damages and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(1), (2), and (3), on behalf of a class as follows:

> All persons and entities who, as residents of Canada, paid for an app through the Google Play Store, or paid for in-app digital content (including subscriptions and/or ad free versions) on an app that was offered on the Google Play Store on or after January 27, 2021 (Class Period).

214.    Based upon the nature of the trade and commerce involved, Plaintiff believes that the total number of Class members is in the many thousands, and that Class members are geographically

54

1   dispersed throughout Canada. Therefore, joinder of all members of the Class is not practicable.

2       215.    There are questions of law and fact common to the Class which predominate over

3   any questions which may affect only individual members of the Class, including, but not limited to:

4                   a.  The nature and extent of Google's conduct;

5                   b.  Whether Google's conduct violated California's Cartwright Act;

6                   c.  Whether Google's conduct violated California's UCL;

7                   d.  The type and/or measure of damages Plaintiff and Class members suffered as

8                       a result of Google's conduct.

9       216.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff's

10  claims are typical and representative of the claims of all members of the Class.

11      217.    There are no defenses of a unique nature which may be asserted against Plaintiff

12  individually, as distinguished from the other members of the Class, and the relief sought is common

13  to the Class. Plaintiff is a typical purchaser in the Google Play Store, does not have any interest

14  which is in conflict with or is antagonistic to the members of the Class, and has no conflict with any

15  other member of the Class. Plaintiff has retained competent counsel experienced in class-action

16  antitrust litigation to represent him and the Class.

17      218.    A class action is superior to other available methods for the fair and efficient

18  adjudication of this controversy. In the absence of a class action, Google will retain the benefit of

19  its wrongful conduct.

20  **VI.    ANTITRUST INJURY**

21      219.    During the Class Period, Plaintiff and members of the Class who made app or in-app

22  purchases in the Google Play Store were forced to bear the cost of Google's supra-competitive

23  commissions for app and in-app purchases which they would not have had to pay if Google had not

24  engaged in the unlawful activity this action seeks to remedy. Google therefore has caused Plaintiff

25  and Class members to suffer overcharge damages, the full amount of which will be calculated after

26  discovery and upon proof at trial. Because of Defendant's continuing conduct in using its market

27  power, contractual restrictions, commissions, and technical barriers, Plaintiff and members of the

28

Class are reasonably likely to incur future overcharges for app or in-app purchases in the Google Play Store. Both the actual harm and the threat of future harm are cognizable antitrust injuries directly caused by Google's violations of law, as alleged herein.

**FIRST CAUSE OF ACTION: Sherman Act § 1**

**[Unlawful Tying of Google Play Billing to Use of Google Play Store]**

**(Against all Defendants)**

220.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

221.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

222.    Google has illegally tied its in-app payment services to its app distribution services by requiring any app distributed through the Google Play Store to use Google Play Billing for any in-app payments for digital content. Through its Developer Program Policies and DDAs with app developers, Google has contractually ensured that developers cannot offer consumers in-app payment services other than Google's.

223.    The Google Play Store and Google Play Billing are separate products in separate markets. These two products can be sold separately, and there is demand for separate products on the part of both consumers and developers. In other digital ecosystems such as Mac and PC personal computers, applications can and do offer multiple payment options or develop their own payment services. Even within the Android ecosystem, payment services for physical products and services are decoupled from app distribution.

224.    As described above, Google Play Billings are a large business in Canada and constitute a significant volume of commerce.

225.    Google has coerced developers into using its in-app payment services by leveraging its market power in the relevant tying market for Android App Distribution.

226.    The purpose and effect of this tie is to prevent developers from offering different in-

56

app payment services. As a result, Google can charge a supracompetitive price of up to 30% for its payment services, which results in higher costs to consumers of in-app digital content. That cost also reduces app developers' capacity to invest in and create additional apps and in-app content that would otherwise benefit consumers.

227.    Other third-party payment services offer pricing at less than one tenth of Google's supracompetitive price but are foreclosed from offering their services within apps that are distributed through the Google Play Store.

228.    There are no procompetitive efficiencies from this tie that outweigh the harm to consumers. App developers and app users are each harmed by Google's forced intermediation of in-app payment processing. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

229.    Google has engaged in a continuous course of unlawful anticompetitive conduct.

230.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff and the Class were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

231.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

**SECOND CAUSE OF ACTION: Sherman Act § 2**

**[Monopoly Maintenance in the In-App Payment Processing Market]**

**(Against all Defendants)**

232.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

233.    This cause of action is brought under Section 2 of the Sherman Act, 15 U.S.C. § 2, which prohibits "monopoliz[ation of] any part of the trade or commerce among the several states, or with foreign nations."

234.    The IAP Processing Market within Canada is the product and geographic market relevant to this claim.

235.    Google has monopoly power in the IAP Processing Market through Google Play Billing.

236.    Google has unlawfully maintained that monopoly power through the conduct and contractual relationships described above.

237.    Google's conduct has substantial anticompetitive effects, including increased prices to consumers and costs to developers, reduced innovation and quality of service, and lowered output of apps.

238.    Google has engaged in a continuous course of unlawful anticompetitive conduct.

239.    There are no procompetitive justifications for Google's conduct. Alternatively, to the extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

240.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained

58

competition. Plaintiff and the Class were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

241.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

242.    In the alternative, the In-App Payment Processing Market constitutes a derivative aftermarket of the App Distribution Market. The In-App Payment Processing Market is a secondary market that depends upon the existence of the Android App Distribution Market and is necessary to use Android apps as they are intended. Google's conduct in using its position in the App Distribution Market to maintain its monopoly over the In-App Payment Processing Market constitutes monopoly maintenance in violation of Section 2 of the Sherman Act.

243.    Google improperly exploited its relationships with customers who acquired Android apps by locking them in, through the conduct herein alleged.

244.    Because of the history, perception and statements about Android as an open system, and the Play Store as a "market" among other things, these constraints were imposed upon the members of the Class without their knowledge or consent, locking them into an aftermarket for in-app payment processing that was monopolized by Google. Consumers did not have the ability to accurately forecast the cost of this aftermarket monopoly by calculating the lifecycle cost.

245.    Because Google charged supra-competitive prices in the In-App Payment Processing Market, consumers who were locked into this market were harmed thereby. Google violated Section 2 of the Sherman Act by monopolizing or attempting to monopolize the In-App Payment Processing Market aftermarket in a manner that harmed competition and injured Android consumers by reducing output and consumer choice, and by increasing prices for in-app purchases to supra-competitive levels.

1

2

3

**THIRD CAUSE OF ACTION: Sherman Act § 1**

**[Unreasonable Restraints of Trade in the In-App Payment Processing Market]**

**(Against all Defendants)**

4      246.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully

5   set forth herein.

6      247.    This cause of action is brought under Section 1 of the Sherman Act, 15 U.S.C. § 1,

7   which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in

8   restraint of trade or commerce among the several States, or with foreign nations."

9      248.    Google forces app developers to enter its standardized DDA, including Developer

10  Program Policies integrated into that Agreement, as a condition of having their apps distributed

11  through the Google Play Store. The relevant provisions of these agreements unreasonably restrain

12  competition in the IAP Processing Market.

13     249.    Section 3.2 of the DDA requires that Android app developers enter into a separate

14  agreement with Google's payment processor, Google Payment, in order to receive payment for apps

15  and content distributed through the Google Play Store. This includes payments related to in-app

16  purchases of digital content. Further, compliance with Google's Developer Program Policies, which

17  Section 4.1 of the DDA makes obligatory, requires that apps distributed through the Google Play

18  Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment"

19  for such in-app purchases. Google's Developer Program Policies exclude only certain, limited types

20  of transactions from this requirement, such as the purchase of "solely physical products" or of

21  "digital content that may be consumed outside of the app itself."

22     250.    Google's conduct has substantial anticompetitive effects, including increased prices

23  to consumers and costs to developers, reduced innovation and quality of service, and reduced output

24  of apps.

25     251.    Google has engaged in a continuous course of unlawful anticompetitive conduct.

26     252.    There are no procompetitive justifications for Google's conduct. Alternatively, to the

27  extent that any such procompetitive benefits exist, they are outweighed by the anticompetitive

28

effects of Google's conduct and could have been achieved through less anticompetitive and less harmful means.

253.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff and the Class were further injured because Google's establishment and maintenance of supracompetitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

254.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

**FOURTH CAUSE OF ACTION: California Cartwright Act**

**[Unreasonable Restraints of Trade in Android App Distribution Market]**

**(Against all Defendants except Google Payment)**

255.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

256.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq*., which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

257.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

258.    The Android App Distribution Market is a valid antitrust market.

259.    Google has executed agreements with OEMs that unreasonably restrict competition

in the Android App Distribution Market. Namely, Google has entered into MADAs with OEMs that require OEMs to offer the Google Play Store as the primary—and practically the only—app store on Android mobile devices. These agreements further prevent OEMs from offering alternative app stores on Android mobile devices in any prominent visual positioning.

260.    Google's conduct and practices have substantial anti-competitive effects, including increased prices and costs, reduced innovation, poorer quality of customer service and lowered output.

261.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California. Moreover, Google's terms of service state that the Defendants' relationship with Plaintiff and the proposed Class is governed by California law.

262.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

263.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

1

2

3

**FIFTH CAUSE OF ACTION: California Cartwright Act**

**[Unreasonable Restraints of Trade in Android App Distribution Market]**

**(Against all Defendants except Google Payment)**

4       264.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully

5   set forth herein.

6       265.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

7   Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

8   persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

9       266.    Under the Cartwright Act, a "combination" is formed when the anti-competitive

10  conduct of a single firm coerces other market participants to involuntarily adhere to the anti-

11  competitive scheme.

12      267.    The Android App Distribution Market is a valid antitrust market.

13      268.    Google conditions distribution through the Google Play Store on entering into the

14  standardized DDA described above, including the Developer Program Policies integrated therein.

15  Through certain provisions in these agreements, Google forces app developers to submit to

16  conditions that unreasonably restrain competition in the Android App Distribution Market.

17      269.    Section 4.5 of the DDA provides that developers "may not use Google Play to

18  distribute or make available any Product that has a purpose that facilitates the distribution of

19  software applications and games for use on Android devices outside of Google Play." Section 4.1

20  of the DDA requires that all developers "adhere" to Google's Developer Program Policies. Under

21  the guise of its so-called "Malicious Behavior" Policy, Google prohibits developers from

22  distributing apps that "download executable code [*i.e.*, code that would execute an app] from a

23  source other than Google Play." The DDA further reserves to Google the right to remove and disable

24  any Android app that it determines violates either the DDA or its Developer Program Policies and

25  to terminate the DDA on these bases. (§§ 8.3, 10.3.) These provisions prevent app developers from

26  offering competing app stores through the Google Play Store, even though there is no legitimate

27  technological or other impediment to distributing a competing app store through the Google Play

28

63

1    Store.

2        270.    These provisions have no legitimate or pro-competitive purpose or effect, and

3    unreasonably restrain competition in the Android App Distribution Market.

4        271.    Google's conduct and practices have substantial anti-competitive effects, including

5    increased prices and costs, reduced innovation, poorer quality of customer service, and lowered

6    output.

7        272.    It is appropriate to bring this action under the Cartwright Act because many of the

8    illegal agreements were made in California and purport to be governed by California law, Google

9    has its principal place of business in California, and overt acts in furtherance of Google's anti-

10   competitive scheme took place in California.

11       273.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and

12   the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid

13   more for Android apps than they would have paid in a competitive market. Google's unlawful

14   restraints of trade extinguished consumers' freedom to choose between the Google Play Store and

15   lower-cost market alternatives that would have been available had Google not restrained

16   competition. Plaintiff and the Class were further injured because Google's establishment and

17   maintenance of supra-competitive pricing has caused a reduction in the output, supply, quality, and

18   innovation of Android apps, all of which would have been more abundant in a competitive market.

19       274.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered

20   and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to

21   suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction

22   ending Google's anticompetitive conduct.

23                     **SIXTH CAUSE OF ACTION: California Cartwright Act**

24   **[Unreasonable Restraints of Trade in Android In-App Payment Processing Market]**

25                                **(Against all Defendants)**

26       275.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully

27   set forth herein.

28

276.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

277.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

278.    The Android App Distribution Market and Android In-App Payment Processing Market are valid antitrust markets.

279.    Google has monopoly power in the Android In-App Payment Processing Market.

280.    Google conditions distribution through the Google Play Store on entering into the standardized DDA described above, including the Developer Program Policies integrated therein. Through certain provisions in these agreements, Google forces app developers to submit to conditions that unreasonably restrain competition in the Android In-App Payment Processing Market.

281.    Section 3.2 of the DDA requires that Android app developers enter into a separate agreement with Google's payment processor, Defendant Google Payment, in order to receive payment for apps and content distributed through the Google Play Store. This includes payments related to in-app purchases. Further, Google's Developer Program Policies, compliance with which Section 4.1 of the DDA makes obligatory, require that apps distributed through the Google Play Store "must use Google Play In-app Billing [offered by Google Payment] as the method of payment" for in-app purchases. While Google's Policies exclude certain types of transactions from this requirement, such as the purchase of "solely physical products" or of "digital content that may be consumed outside of the app itself," Google expressly and discriminatorily applies its anti-competitive mandate to every "game downloaded on Google Play" and to all purchased "game content," such as purchases made within a game.

282.    These provisions have no legitimate or pro-competitive purpose or effect, and unreasonably restrain competition in the Android In-App Payment Processing Market.

1      283.    Google's conduct and practices have substantial anti-competitive effects, including

2  increased prices and costs, reduced innovation, poorer quality of customer service, and lowered

3  output.

4      284.    It is appropriate to bring this action under the Cartwright Act because many of the

5  illegal agreements were made in California and purport to be governed by California law, Google

6  has its principal place of business in California, and overt acts in furtherance of Google's anti-

7  competitive scheme took place in California.

8      285.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and

9  the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid

10  more for Android apps than they would have paid in a competitive market. Google's unlawful

11  restraints of trade extinguished consumers' freedom to choose between the Google Play Store and

12  lower-cost market alternatives that would have been available had Google not restrained

13  competition. Plaintiff and the Class were further injured because Google's establishment and

14  maintenance of supra-competitive pricing has caused a reduction in the output, supply, quality, and

15  innovation of Android apps, all of which would have been more abundant in a competitive market.

16      286.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered

17  and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to

18  suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction

19  ending Google's anticompetitive conduct.

20            **SEVENTH CAUSE OF ACTION: California Cartwright Act**

21            **[Tying Google Play Store to Google Play Billing]**

22                      **(Against all Defendants)**

23      287.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully

24  set forth herein.

25      288.    Google's acts and practices detailed above violate the Cartwright Act, Cal. Bus. &

26  Prof. Code § 16700 *et seq.*, which prohibits, *inter alia*, the combination of resources by two or more

27  persons to restrain trade or commerce or to prevent market competition. *See* §§ 16720, 16726.

28

289.    Under the Cartwright Act, a "combination" is formed when the anti-competitive conduct of a single firm coerces other market participants to involuntarily adhere to the anti-competitive scheme.

290.    The Cartwright Act also makes it "unlawful for any person to lease or make a sale or contract for the sale of goods, merchandise, machinery, supplies, commodities for use within the State, or to fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement or understanding that the lessee or purchaser thereof shall not use or deal in the goods, merchandise, machinery, supplies, commodities, or services of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement or understanding may be to substantially lessen competition or tend to create a monopoly in any line of trade or commerce in any section of the State." § 16727.

291.    As detailed above, Google has unlawfully tied its in-app payment processor, Google Play Billing, to the Google Play Store through its DDAs with app developers and its Developer Program Policies.

292.    Google has sufficient economic power in the tying market, the Android App Distribution Market, to affect competition in the tied market, the Android In-App Payment Distribution Market. With Google Play Store installed on nearly all Android OS devices and over 90% of downloads on Android OS devices being performed by the Google Play Store, Google has overwhelming market power. Google's market power is further evidenced by its ability to extract supra-competitive taxes on the sale of apps through the Google Play Store.

293.    The availability of the Google Play Store for app distribution is conditioned on the app developer accepting a second product, Google's in-app payment processing services. Google's foreclosure of alternative app distribution channels forces developers like Epic to use Google's in-app payment processing services, which Google has expressly made a condition of reaching Android users through its dominant Google Play Store.

294.    The tying product, Android app distribution, is separate and distinct from the tied product, Android in-app payment processing, because app developers have alternative in-app

payment processing options and would prefer to choose among them independently of how an Android app is distributed. Google's unlawful tying arrangement thus ties two separate products that are in separate markets.

295.    Google's conduct forecloses competition in the Android In-App Payment Processing Market, affecting a substantial volume of commerce in this Market.

296.    Google has thus engaged in a *per se* illegal tying arrangement and the Court does not need to engage in a detailed assessment of the anti-competitive effects of Google's conduct or its purported justifications.

297.    Even if Google's conduct does not form a *per se* illegal tie, an assessment of the tying arrangement would demonstrate that it is unreasonable under the Cartwright Act, and therefore, illegal.

298.    Google's acts and practices detailed above unreasonably restrain competition in the Android In-App Payment Processing Market.

299.    It is appropriate to bring this action under the Cartwright Act because many of the illegal agreements were made in California and purport to be governed by California law, Google has its principal place of business in California, and overt acts in furtherance of Google's anti-competitive scheme took place in California.

300.    Google's anticompetitive conduct has harmed competition and harmed Plaintiff and the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

301.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to

suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

**EIGHTH CAUSE OF ACTION: California Unfair Competition Law**

**(Against all Defendants)**

302.    Plaintiff repeats and realleges every preceding allegation of this Complaint as if fully set forth herein.

303.    Google's conduct, as described above, violates California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.*, which prohibits any unlawful, unfair or fraudulent business act or practice.

304.    Plaintiff has standing to bring this claim because he has suffered injury in fact and lost money as a result of Google's unfair competition. Specifically, Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market.

305.    Google's conduct violates sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the Cartwright Act, and thus constitutes unlawful conduct under § 17200.

306.    Google's conduct is also "unfair" within the meaning of the Unfair Competition Law.

307.    Google's conduct has harmed competition and harmed Plaintiff and the Class in a manner the antitrust laws were intended to prevent. Plaintiff and the Class have paid more for Android apps than they would have paid in a competitive market. Google's unlawful restraints of trade extinguished consumers' freedom to choose between the Google Play Store and lower-cost market alternatives that would have been available had Google not restrained competition. Plaintiff and the Class were further injured because Google's establishment and maintenance of supra-competitive pricing has caused a reduction in the output, supply, quality, and innovation of Android apps, all of which would have been more abundant in a competitive market.

308.    As a result of Google's anticompetitive conduct, Plaintiff and the Class have suffered and continue to suffer damages. Additionally, Plaintiff and the Class have suffered and continue to suffer irreparable injury for which no adequate remedy at law exists and therefore seek an injunction ending Google's anticompetitive conduct.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the members of the Class, prays for judgment against Google as follows:

1.      Determining that this action may proceed and be maintained as a class action and that Plaintiff be certified as the Class representative;

2.      That the Court award Plaintiff and the proposed Class all appropriate relief, to include, but not be limited to, injunctive relief requiring that Google cease the abusive, unlawful, and anticompetitive practices described herein; declaratory relief, adjudging such practices unlawful; as well as monetary relief, whether by way of restitution or damages, including treble damages, or other multiple or punitive damages, or restitution, where mandated by law or equity or as otherwise available; together with recovery of the costs of suit, to include reasonable attorneys' fees, costs, and expenses, together with pre- and post-judgment interest to the maximum levels permitted by law or equity;

3.      That the Court grant such additional orders or judgments as may be necessary to prevent the unlawful practices complained of herein; and

4.      That the Court award Plaintiff and the proposed Class such other, favorable relief as may be available and appropriate under the law or at equity.

**JURY TRIAL DEMANDED**

Plaintiff requests a jury trial on all matters so triable.

Dated: January 27, 2025

Respectfully submitted,

*/s/ Robert J. Gralewski, Jr.*
ROBERT J. GRALEWSKI, JR. (CA Bar No. 196410)
**KIRBY McINERNEY LLP**
1420 Kettner Boulevard, Suite 100
San Diego, CA 92101
Telephone: 858-834-2044
BGralewski@kmllp.com

DAVID E. KOVEL (*pro hac vice* forthcoming)
LAUREN WANDS (*pro hac vice* forthcoming)
**KIRBY McINERNEY LLP**
250 Park Avenue, Suite 820
New York, New York 10177
Telephone: (212) 371-6600
DKovel@kmllp.com
LWands@kmllp.com

MARK C. RIFKIN (*pro hac vice* forthcoming)
THOMAS H. BURT (*pro hac vice* forthcoming)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, New York 10016
Telephone: (212) 545-4600
Rifkin@whafh.com
Burt@whafh.com

*Counsel for Plaintiff and the Proposed Class*

CLASS ACTION COMPLAINT